WALTER BECKWORTH, *ET AL.,* PLAINTIFFS-APPELLANTS, v. NEW JERSEY STATE PAROLE BOARD, DEFENDANT-RESPONDENT.

Argued January 8, 1973—Decided March 19, 1973.

Mr. *Michael L. Perlin,* First Assistant Public Defender and *Miss Barbara Swartz* argued the cause for the appellants (Mr. *Stanley C. Van Ness,* Public Defender, attorney).

Mrs. *Virginia Long Annich,* Deputy Assistant Attorney General, argued the cause for the respondent (Mr. *George F. Kugler, Jr.,* Attorney General, attorney; Mr. *Stephen Skillman,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

JACOBS, J. In *Monks v. New Jersey State Parole Board,* 58 *N. J.* 238 (1971), this Court directed that the Board replace its prior rule by one "designed generally towards affording statements of reasons on parole denials." 58 *N. J.* at 249. Thereafter the Board gave terse statements of reasons which the inmates quickly challenged before the Appellate Division, largely on grounds of their patent insufficiency. In the Appellate Division most of the inmates were represented by the Office of the Public Defender and some by the Office of the Camden Regional Legal Services and their appeals were consolidated for argument. On March 1, 1972 the Appellate Division, pursuant to an application by the inmate appellants, directed that each appellant's pre-parole record be furnished to his counsel; this was done and on April 3, 1972 briefs on behalf of the appellants were duly filed.

Thereafter, on April 28, 1972, the Board moved that the appeals be remanded to it for its reconsideration. A new fulltime chairman of the Board had taken office, an in-depth study of the parole procedures had been undertaken and the Board was prepared to alter previous practices and to ex-

press "as clearly and as extensively as possible the reasons underlying a parole denial." The motion was granted and in due course the Board reheard all of the inmate appellants. As a result many of them were paroled and those denied parole were in general given full statements of reasons. Supplementary briefs were filed on behalf of those who were still denied parole and their matters were awaiting argument in the Appellate Division when we certified pursuant to *R*. 2:12–1. Our purpose in certifying was not to deal with the attendant facts or the propriety of each individual denial but to deal only with the significant common legal issues raised by the parties. We of course envisioned that the ensuing legal determinations would helpfully serve as general guidelines for the Appellate Division and the Parole Board, in not ony these appeals but in others as well; we are advised that several hundred appeals from parole denials are now pending in the Appellate Division. At the oral argument before this Court we notified counsel to avoid, insofar as possible, discussion of the individual matters and we shall now do much the same although we shall, largely for purposes of convenient illustration, detail the facts involving Walter Beckworth, the inmate chosen solely because his name appears first in these proceedings.

Beckworth was born in 1926, was married and divorced by 1950, was ceremoniously married in 1951 and again in 1954, each of these marriages being annulled, and thereafter lived with a common law wife. In 1964 he separated from this wife and moved into the home of a friend. He had an affair with his friend's wife and after an argument he strangled her and slashed her throat. He was indicted for murder and pleaded non vult. His presentence probation report referred to several arrests, including arrests for drunkenness and driving while drunk, which did not result in convictions and to an arrest for attempted suicide which was followed by a conviction and sixty-day jail sentence for disorderly conduct. On the murder charge the court sentenced him to a State Prison term of 15 to 20 years. He was received at the Prison

in 1964 and became eligible for parole consideration in 1968. He first appeared before the Parole Board on May 7, 1968. The Board had before it his complete pre-parole record which included a report from a consultant psychologist who had examined Beckworth and had expressed the view that Beckworth had a repressed hostility towards females who frustrated "his dependency needs." The psychologist recommended that Beckworth's confinement, then at Leesburg, be continued and that he receive "counselling of an insight oriented nature."

In 1970 Beckworth again appeared before the Parole Board. This time the Board had recent reports from a consulting psychologist who noted that Beckworth had "a low tolerance for stresses arising from relationships with women" and from an institutional clinical psychiatrist who expressed the view that becaue of Beckworth's "hostility towards females" there was "still the danger of threat to society." On May 5, 1970 the Board denied parole and directed that the matter be reheard in May 1972. On May 21, 1970 Beckworth escaped from Leesburg and was not apprehended for 184 days; for this escape he was sentenced to serve one year and one month consecutive to his sentence on the murder charge. In July 1971 the Board directed that Beckworth be reheard in September 1971 on both his murder and escape sentences; he was so heard and at that time the Board had a further report from a consulting psychologist who noted that Beckworth demonstrated "very poor judgment," did not recognize "his own part in the circumstances which brought him to prison" and will have "great difficulty adjusting to community living." He viewed Beckworth as "a poor risk for parole" and on September 21, 1971 the Board denied parole, setting forth as the reason for denial, the "seriousness of criminal offenses and escape." His next hearing was scheduled for September 1973, but after Beckworth had taken his appeal and the matter had been remanded on the Board's application, he was actually heard on June 7, 1972. At this

hearing the Board again denied parole and set forth its reasons in the following form:

Parole has been denied regardless of the availability of a suitable parole plan. Your case has been scheduled for rehearing in May 1973.

After consideration of the circumstances of your present offense, and in the absence of any statement by the sentencing court tending to indicate the contrary, the Board has concluded that there are certain punitive and deterrent aspects to your sentence. In the absence of any special or equitable circumstances or any affirmative evidence that you can avoid criminal behavior, and since your minimum sentence has not yet expired, the Board feels that the punitive and deterrent aspects of your sentence have not been fulfilled and that, therefore, your release would not be compatible with the community welfare.

After consideration of all records relevant to your confinement, treatment and efforts towards self-improvement while in the N. J. State Prison System, the Board is unable to conclude that there is reasonable probability that you will return to society without violation of law.

The Board feels that you have had an excellent institutional adjustment with the exception of your escape from Leesburg in May of 1970. Your receipt of a GED certificate is also noted, as is the fact that you have served almost 8 years in prison.

The Board would note certain elements which might be construed as "situational" in your murder of a friend's wife with whom you were emotionally involved. However the Board finds strong indications of a longstanding hostility to females in your history and a potential for violent or aggressive reaction. These indications include your attempted suicide in 1950, your unstable marriages to three different women, your continuing projections of blame on them for marriage failures, and the various reports of professional treatment staff.

Moreover your escape from prison, your prior attempt at self-destruction, your reported excessive use of alcohol and the circumstnaces of the present murder, cause the Board concern that you still have the potential to react to not unusual situations where your concepts of masculinity are threatened with impulsive behavior.

There is nothing which affirmatively indicates that you can refrain from serious aggression and parole is therefore denied.

 The foregoing clearly satisfied the immediate goals of *Monks* (58 *N. J.* 238). Beckworth was told why he was turned down for parole and if he was earlier in the dark he no longer is. He has filed an affidavit in which he start-

lingly asserts that during his marriages his "personal life was stable" and in which he denies "any history of alcoholism" or that he ever "attempted to commit suicide." There would appear to be more than enough in the Board's records to justify the Board's inferences with respect to these matters but, in any event, they are in nowise crucial for the heart of Beckworth's turndown was grounded on and amply supported by the recorded circumstances relating to his relationships with women and the murder of his friend's wife and the reports of the psychiatrist and psychologists who examined him on various occasions. The Board was unable to find reasonable probability that if Beckworth were released on parole he would "assume his proper and rightful place in society, without violation of the law, and that his release is not incompatible with the welfare of society." *N. J. S. A.* 30 :4–123.14. Surely we are in no position whatever to say that it should have made such finding or that its denial of parole was in any sense arbitrary or in abuse of its broad discretion. *Puchalski v. N. J. State Parole Board,* 104 *N. J. Super.* 294, 300 (*App. Div.*), aff'd, 55 *N. J.* 113 (1969), cert. denied, 398 *U. S.* 938, 90 S. Ct. 1841, 26 *L. Ed. 2d* 270 (1970) ; *State v. Lavelle,* 54 *N. J.* 315, 325 (1969).

*Monks* was not intended to and did not restrict the breadth of the Board's discretion in granting or denying parole. 58 *N. J.* at 249. It was an exercise of this Court's constitutional prerogative writ jurisdiction to insure that the official action below was neither arbitrary nor unlawful. It directed that, as a matter of fairness, the inmate be given the reasons for denial of his parole and, as we have already indicated, Beckworth received them, in adequate measure. *Monks* pointed out that the requirement that reasons be properly stated "would also serve as a suitable and significant discipline on the Board's exercise of its wide powers" (58 *N. J.* at 249) and the very history of this litigation may be cited as evidential confirmation. The *Beckworth* format, which we view as sufficient, was apparently followed in the other pending appeals and the Board has represented that

additional steps aimed at improving the parole process, beyond the immediate requirements of *Monks,* are already under way.

The Board has recently engaged several parole counsellors, an executive director, a community placement specialist and additional secretarial personnel. It has not as yet promulgated pertinent regulations but it apparently plans formally to adopt procedures along the following lines: in due course before an inmate's eligibility date arrives, his name will be transmitted to a parole counsellor who will assume ultimate responsibility for the proper preparation of institutional reports and the compilation of classification materials. These will be transmitted to the executive director who will review each inmate's case with a Board member. This preliminary review will identify probable areas of concern and will also identify possible resources and treatments available in the community. If the preliminary review indicates that special community placement is in order, or that the inmate could be released to the community on special condition—*e. g.,* that he attend A.A., receive psychiatric help, enroll in vocational school, etc.—then the community placement specialist will cooperate with the Board in exploring the feasibilities of such arrangements.

The brief submitted on the Board's behalf sets forth that: "After the preliminary review, a notice will be sent to the inmate and to his Parole Counsellor advising of the Board's areas of concern. The counsellor will then meet with the inmate to discuss the Board's expressed areas of difficulty and to show the objective reports and records in the inmate's file to him. The Parole Counsellor will counsel the inmate as to how to best reply to the Board's expressed areas of concern at the parole interview, and will also generally apprise the inmate of the nature and purpose of the parole interview. Nothing in this procedure will preclude an inmate from contacting an attorney or other person in preparing for a parole interview, although such attorney or other person may not attend the interview itself." *N. J.*

*S. A.* 30:4–123.25; *Puchalski v. N. J. State Parole Board, supra,* 104 *N. J. Super.* at 298; *Menechino v. Oswald,* 430 *F. 2d* 403, 406 (2 *Cir.* 1970), *cert. denied,* 400 *U. S.* 1023, 91 S. Ct. 588, 27 *L. Ed. 2d* 635 (1971): A recent Parole Board inter-office memorandum dated February 16, 1973 advises that since December 1972 "the parole counsellors have been reviewing each inmate's file with the inmate prior to his appearance before the Board"; that a "written pre-parole interview summary is prepared for each man and forwarded to the Board with a copy sent to the inmate"; and that "both verbal and written counselling efforts are directed at obtaining more information about the inmate as an individual and advising him of his best arguments for favorable parole consideration."

On July 17, 1972 Senate Bill No. 1122 was introduced in the New Jersey Senate and is still pending. The Board's inter-office memorandum points out that if this bill becomes law it "will make an estimated 2800 inmates immediately eligible for parole Rehearing by eliminating eligibility based on offender status and by changing the statutory criteria for parole." The pendency of this bill along with budgetary problems may delay full implementation of the Board's procedural plans but its memorandum assures that "establishment of the revised procedures remains a primary objective of the Board." We of course express no opinion with respect to the pending bill nor do we make any dispositive determinations with respect to the Board's most recently revised procedures. We refer to them to indicate the steps which have already been taken and the trend of the current movements and will consider them only to the extent that they bear fairly and properly on the common legal issues which have been raised before us by the parties. We shall now deal with those issues largely in the order in which they have been presented.

The appellants contend that the parole provisions in Title 30 (*N. J. S. A.* 30:4–106 *et seq.*), along with the provisions of the Administrative Procedure Act (*N. J. S. A.* 52:14B–1

*et seq.*), entitle them to detailed findings of fact beyond those which may be gathered from the Board's statements of reasons pursuant to *Monks* (58 *N. J.* 238). We find no merit in this contention. *N. J. S. A.* 30:4–123.5 sets forth that the Parole Board shall, subject to the statutory directions, determine when and under what conditions persons may be released on parole. Later sections empower the Board to promulgate pertinent rules and regulations (*N. J. S. A.* 30:4–123.6) and to obtain the necessary records and information in connection with its consideration of parole. *N. J. S. A.* 30:4–123.7 *et seq.* Before reaching a decision, the Board is directed to have the inmate appear before it and personally interview him "to consider his ultimate fitness for parole, and verify as far as possible, the information furnished it from other sources." *N. J. S. A.* 30:4–123.19. It is further directed not to release the inmate on parole merely as a reward for good conduct but only if it is of the opinion (1) that there is "reasonable probability" that he will take his place in society "without violation of the law" and (2) that his release is "not incompatible with the welfare of society." *N. J. S. A.* 30:4–123.14. If the Board decides that the inmate is not to be released it must "notify him of such decision and the date when his case will again be considered." *N. J. S. A.* 30:4–123.19.

Title 30 contains no direction for findings of fact in connection with a parole denial nor does the Administrative Procedure Act contain such direction. When that Act was originally passed by the Legislature and submitted to the Governor it contained very clear and comprehensive language exempting boards concerned with "the management, confinement, discipline or release of inmates" of penal or correctional institutions. The Governor conditionally vetoed the bill in a message which noted that the exemption evidenced the Legislature's awareness that, while requirements for publication of rules and for notice and hearing were appropriate in matters affecting the general public, they were neither necessary nor proper to the internal operations of institutions.

He recommended that the Legislature "enlarge" its exemption to include educational and medical as well as correctional institutions.

■■ Pursuant to the Governor's recommedation the Act was amended and enacted in its present form to exempt all State agencies whose primary responsibility is the management or operation of an "educational, medical, mental, rehabilitative, custodial, penal or correctional institution or program, insofar as the acts of such agency relate to the internal affairs of such institution or program." *N. J. S. A.* 52:14B-2(a). Notwithstanding this alteration in the language, we believe that it is fairly to be inferred from the enlightening history that the Administrative Procedure Act was never intended to apply to parole release proceedings conducted in accordance with Title 30. Furthermore we believe that the interview called for by *N. J. S. A.* 30:4-123.19 is not a proceeding of such "adversary" nature (*Menechino v. Oswald, supra,* 430 *F.* 2d at 407) as to constitute a "contested case" within the statutory requirements or the contemplation of *N. J. S. A.* 52:14B-2(b). *Cf. Hyser v. Reid,* 115 *U. S. App. D. C.* 254, 318 *F. 2d* 225, 236-237 (*D. C. Cir.*), *cert. denied sub nom. Thompson v. United States Parole Board,* 375 *U. S.* 957, 84 S. Ct. 446, 11 *L. Ed. 2d* 315 (1963); *Hiatt v. Compagna,* 178 *F. 2d* 42, 44-45 (5 *Cir.* 1949), *aff'd by equally divided Court,* 340 *U. S.* 880, 71 S. Ct. 192, 95 *L. Ed.* 639 (1950); Note, "The Supreme Court, 1971 Term," 86 *Harv. L. Rev.* 1, 100-01 n. 29.

The appellants point out that in *Monks* (58 *N. J.* 238), we cited cases such as *Abbotts Dairies, Inc. v. Armstrong,* 14 *N. J.* 319 (1954), where the legislative provision that the milk Director make "findings of fact" was described as being "of the utmost importance not only in insuring a responsible and just determination by the Director, but also in affording a proper basis for effective judicial review." 14 *N. J.* at 332-333. In *Monks* we were of course aware that there was no comparable legislative provision applicable to the Parole Board and that, unlike the determinations of the

usual administrative agencies, the Parole Board's determinations were impregnated with highly predictive and individualized discretionary appraisals. But as a matter of elemental fairness we called for a statement of reasons which would, as in *Abbotts*, also well serve as an administrative discipline and as basis for judicial review. We did not call for, and indeed sought to avoid, the full trappings of adversary trial-type proceedings which would in all likelihood so burden and delay the entire parole release process as to disadvantage the very interests of the inmates themselves as well as the public interest. *Cf. The New Jersey Penal Code, Final Report*, Vol. II *Commentary, pp.* 353–54 (1971).

The appellants attack the nature of the reasons submitted by the Parole Board for the Beckworth denial along with the other denials; in the process they display an approach to parole which appears to us to be wholly incompatible with the legislative designs and the criteria set forth in *N. J. S. A.* 30:4–123.14. Thus they consider the reasons given to Beckworth as insufficient because they did not provide much in the way of "guidelines" to him for his future behavior and because they were based in part on "immutable" circumstances, namely, those which "existed at the time of sentencing and will continue to exist." Beckworth was told that his "projections of blame" on his former wives was one of the indications of his continuing hostility and was in effect told of the adverse psychiatrical and psychological reports; all these may be viewed as guidelines and if Beckworth's underlying attitudes and understandings are appropriately altered they undoubtedly will have material bearing on later application for parole. He was also notified that his total history including the murder of his friend's wife evidenced the continuing potential for violent reaction. Of course the striking facts surrounding the murder are immutable in the sense advanced by counsel but the Board clearly had the right to consider them and indeed would be derelict in its duty if it failed to do so. *Cf.* Dawson, "The Decision to Grant or Deny Parole: A Study of Parole Cri-

teria in Law and Practice," 1966 *Wash. U. L. Q.* 243; Notes, 6 *J. Law Reform* 131 (1972); 2 *New Mexico L. Rev.* 234 (1972).

█ The statutory criteria in *N. J. S. A.* 30:4–123.14 contemplate parole release only where the Board is of the opinion both (1) that there is reasonable probability that the inmate will be law-abiding and (2) that the release is compatible with society's welfare. Common sense dictates that its prediction as to future conduct and its opinion as to compatibility with the public welfare be grounded on due consideration of the aggregate of all of the factors which may have any pertinence. Dawson, *supra,* 1966 *Wash. U. L. Q.* 243, has identified and illustrated pertinent factors which have actually been considered by parole boards elsewhere; they include, *inter alia,* matters which have been tersely summarized as follows: "(1) psychological change, (2) participation in institutional programs, (3) institutional adjustment, (4) criminal record, (5) prior experience under community supervision, (6) parole plan, (7) circumstances of the offense, (8) seriousness of the anticipated violation, (9) nearness of the mandatory release date, (10) length of time served, (11) parole to a detainer, (12) reward for informant services, (13) brutality of the offense, (14) supporting institutional discipline, (15) minimum amount of time, (16) potential benefit to the inmate, and (17) avoidance of criticism of the parole system." 6 *J. Law Reform, supra* at 146 n. 46. See *Model Penal Code* § 305.13 *et seq.* (Reprint-Tent. Draft No. 5, 1956), § 305.9 *et seq.* (Reprint-Proposed Official Draft 1962); Comment, "The Parole System," 120 *U. Pa. L. Rev.* 282, 304–05 (1971).

█ The Parole Board is vitally concerned with recidivism and is expressly charged by the Legislature to withhold release when it does not have the opinion that there is reasonable probability that the inmate will be law-abiding; it does not have that opinion in Beckworth's case and, as we have already indicated, we consider that its supportive reasons for the ensuing denial are sufficiently grounded. That Beckworth

has, apart from his escape, "had an excellent institutional adjustment" and has received a certificate evidencing his general educational development, does not alter the fact that the Board was, in the full light of his record and the professional reports, unable to find it reasonably probable that Beckworth would not react violently if released. The Parole Board is concerned generally not only with the danger of recidivism, as in Beckworth's case, but also with broader public interests which may independently dictate deferment of release. Illustrative instances may be found included in the Model Penal Code, *supra,* § 305.9 (Proposed Official Draft 1962) which provides that release may be deferred where (1) there is substantial risk that the inmate "will not conform to the conditions of parole," or (2) "release at that time would depreciate the seriousness of his crime or promote disrespect for law," or (3) "release would have a substantially adverse effect on institutional discipline," or (4) continued correctional treatment would substantially increase the inmate's "capacity to lead a law-abiding life when released at a later date." See Dawson, *supra,* 1966 *Wash. U. L. Q.* at 296–303; *Wechsler,* "Codification of Criminal Law in the United States: The Model Penal Code," 68 *Colum. L. Rev.* 1425, 1455–56 (1968).

The Model Penal Code provides that the institutional parole staff shall render reasonable aid to the prisoner in the preparation of his parole plan and in securing information for submission to the Parole Board; it further provides that in preparing for the Parole Board hearing the inmate shall be permitted to consult with any person whose assistance he reasonably desires, including his own counsel, but it does not provide for counsel at the hearing. *Model Penal Code, supra,* § 305.7 (Proposed Official Draft 1962). Similarly the proposed New Jersey Penal Code contains no provision for counsel at the statutory hearing or interview (*N. J. S. A.* 30:4–123.19), although it does embody the *Monks* requirement for a statement of reasons on denial. *New Jersey Penal Code, supra,* Vol. 1, *p.* 168; Vol. II, *pp.*

353–54. The Model Penal Code's approach to pre-hearing consultation has somewhat of a counterpart in *N. J. S. A.* 30:4–123.25 which provides that, before the hearing or interview, the inmate shall have the right to consult his counsel if he feels that his legal rights are invaded and, subject to the consent of the Board, his counsel may submit a brief or legal argument on his behalf. It has not been urged before us that the appellants have been denied the rights afforded under *N. J. S. A.* 30:4–123.25. *Cf. Monks, supra,* 58 *N. J.* at 243; *Puchalski v. N. J. State Parole Board, supra,* 104 *N. J. Super.* at 299, 55 *N. J.* at 115.

However, the appellants have urged that there were procedural infirmities which rendered the parole release hearings or interviews "so unfair" as to deprive them of due process under the Fourteenth Amendment. We find no merit in their contention. Their suggestion that an inmate has a constitutional right to prior notification of pertinent materials in the Board's possession has been repeatedly rejected in the courts. See *Menechino v. Oswald, supra,* 430 *F. 2d* 403; *Walker v. Oswald,* 449 *F. 2d* 481 (2 *Cir.* 1971); *cf. Puchalski v. N. J. State Parole Board, supra,* 104 *N. J. Super.* at 299–300; *Briguglio v. New York State Board of Parole,* 24 *N. Y. 2d* 21, 298 *N. Y. S. 2d* 704, 709–711, 246 *N. E. 2d* 512, 516–517 (1969). We need not pursue the issue here for in the matter at hand their counsel were furnished with the pre-parole records prior to the rehearings resulting in the denials and their accompanying statements of reasons which appear to us, in general, to have been conscientiously prepared and to have been sufficiently informative. Furthermore, the Board's newly announced policies provide broadly for disclosure of the objective data in the inmate's file, notice of the factors which the Board may consider crucial or material, and pre-parole counselling; these policies, faithfully implemented and pursued, should go a long way towards satisfying the pertinent considerations of fairness and towards removing the very grounds for objections of the type advanced before us. See *Model Penal Code, supra,* §

305.7 (Proposed Official Draft 1962); *cf. State v. Kunz,* 55 *N. J.* 128 (1969).

 The appellants assert that the nature of the Board's parole release interview and the "informality surrounding it preclude a hearing conducted with fundamental fairness." In support they point particularly to the absence of any opportunity to examine and cross examine witnesses and the absence of any formal record of the proceeding. In *Nolan v. Scafati,* 306 *F. Supp.* 1 (*D. Mass.* 1969), *vacated,* 430 *F. 2d* 548 (1 Cir. 1970), Judge Wyzanski was faced with the contention that when a prisoner appears before an internal disciplinary committee he has the right to cross examine the prison officials and to call witnesses of his own, including fellow prisoners. He summarily rejected the contention, pointing out that if the prisoner had such right, prison discipline would be greatly impaired. 306 *F. Supp.* at 4; see *Tarlton v. Clark,* 441 *F. 2d* 384, 386 (5 *Cir.*), *cert. denied,* 403 *U. S.* 934, 91 S. Ct. 2263, 29 *L. Ed. 2d* 713 (1971). A similar thought may be expressed with respect to the suggestion that witnesses be available for examination and cross examination at parole release hearings; furthermore the resulting toll on the whole parole release process may be much too high. In any event, the courts have thus far consistently held that fundamental fairness does not call for the opportunity to examine and cross examine witnesses at parole release hearings. See *Menechino v. Oswald, supra,* 430 *F. 2d* 403; *Walker v. Oswald, supra,* 449 *F. 2d* 481; *cf. Puchalski v. N. J. State Parole Board, supra,* 104 *N. J. Super.* at 300; *Briguglio v. New York State Board of Parole, supra,* 298 *N. Y. S. 2d* at 709–711, 246 *N. E. 2d* at 516–517.

The appellants place reliance on the recent Supreme Court decision in *Morrissey v. Brewer,* 408 *U. S.* 471, 92 S. Ct. 2593, 33 *L. Ed. 2d* 484 (1972), but that case involved parole revocation rather than parole release. Two prisoners were released on parole and while out of prison allegedly violated conditions of parole. Their paroles were revoked

without hearing and in regular course they made their attack, contending that due process required hearing prior to revocation. The Court of Appeals held that hearing was not so required but this was reversed in an opinion by Chief Justice Burger who, while declining to determine whether counsel was required on parole revocation (see *State v. Morales,* 120 *N. J. Super.* 197, 202 (*App. Div.* 1972)), did determine that minimal requirements of due process, including notice and opportunity to be heard in person and with witnesses, must be observed in such a proceeding. But the Chief Justice was careful to point out that, unlike a predictive and discretionary parole release proceeding, a parole revocation proceeding involves a specific charge of out-of-prison violation which calls for "a narrow inquiry" which may fairly and flexibly be dealt with in quasi-judicial fashion. 408 U. S. at 483, 489, 92 S. Ct. 2601, 2604, 33 *L. Ed.* 2*d* at 496, 499.

In *Morrissey* the Court, in distinguishing parole release from parole revocation, quoted approvingly from *Bey v. Connecticut Bd. of Parole,* 443 *F.* 2*d* 1079 (2 *Cir.*), *vacated with directions to dismiss as moot,* 404 *U. S.* 879, 92 S. Ct. 196, 30 *L. Ed.* 2*d* 159 (1971), where Judge Kaufman voiced the thought that "it is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom." 443 *F.* 2*d* at 1086. In *Bey* the second circuit held that a parolee is entitled to counsel at a parole revocation hearing, though the same circuit had less than a year earlier held in *Menechino, supra,* 430 *F.* 2*d* 403, that there was no constitutional right to counsel at a parole release hearing. Recognition of the right to counsel at a revocation hearing will not impair prison discipline or burden the parole release process and consequently there is nothing inconsistent in requiring counsel in parole revocation proceedings, while at the same time permitting parole release proceedings to remain largely unfettered. See *Puchalski v.*

N. J. State Parole Board, 'supra, 104 N. J. Super. at 301;
O'Leary and Nuffield, "Parole Decision-Making Character-
istics: Report of a National Survey," 8 *Crim L. Bull.* 651,
666 (1972); Note, "Legal Representation at Parole Revoca-
tion: Proposed Resolution of a Developing Judicial Con-
flict," 40 *Geo. Wash. L. Rev.* 778 (1972); *cf.* Jacob and
Sharma, "Justice After Trial: Prisoners' Need for Legal
Services in the Criminal-Correctional Process," 18 *Kan. L.
Rev.* 493, 540–57 (1970); Note, "Conditional Liberty and
the Fourteenth Amendment," 33 *U. Pitt. L. Rev.* 638
(1972).

Although in *Monks* the appellant had not asserted any
right to counsel at the parole release interview or hearing
we specifically pointed out that the courts had thus far
not recognized any such right. 58 *N. J.* at 244; see *Puchal-
ski v. N. J. State Parole Board, supra,* 104 *N. J. Super.* 294,
55 *N. J.* 113; *Menechino v. Oswald, supra,* 430 *F. 2d* 403;
*Buchanan v. Clark,* 446 *F. 2d* 1379 (5 *Cir.*), *cert. denied,*
404 *U. S.* 979, 92 S. Ct. 347, 30 *L. Ed. 2d* 294 (1971);
*Lewis v. Rockefeller,* 431 *F. 2d* 368 (2 *Cir.* 1970); *Ott v.
Ciccone,* 326 *F. Supp.* 609 (*D. Mo.* 1970); *Schawartzberg
v. United States Board of Parole,* 399 *F. 2d* 297 (10 *Cir.*
1968); *Sorensen v. Young,* 282 *F. Supp.* 1009 (*D. Minn.*
1968); *Briguglio v. New York State Board of Parole,
supra,* 24 *N. Y. 2d* 21, 298 *N. Y. S. 2d* 704, 246 *N. E. 2d*
512; *In re Schoengarth,* 66 *Cal. 2d* 295, 57 *Cal. Rptr.* 600,
425 *P. 2d* 200 (1967); Comment, "The Parole System,"
*supra,* 120 *U. Pa. L. Rev.* at 359–60; Note, 1971 *U. Toledo
L. Rev.* 585, 587 (1971). Subsequent to *Monks* we held in
*Rodriguez v. Rosenblatt, et al.,* 58 *N. J.* 281 (1971), that,
as a matter of simple justice, a defendant in a municipal
court proceeding is entitled to be represented by counsel
prior to any conviction entailing imprisonment in fact or
other consequence of magnitude. See *Argersinger v. Hamlin,*
407 *U. S.* 25, 92 *S. Ct.* 2006, 32 *L. Ed. 2d* 530 (1972).
The appellants urge that the considerations which under-
lay *Rodriguez* should lead now towards recognition of

the right to counsel at parole release hearings. But the distinctions are evident for *Rodriguez* was not concerned with proceedings comparable to parole release hearings which revolve around highly discretionary and predictive weighings, nor was it concerned with the special problems attendant on hearings within complex prison systems or with the resultant burdens on the parole process. See *Menechino v. Oswald, supra,* 430 *F. 2d* at 409–410.

The appellants place reliance on discussions such as the one by Messrs. Jacob and Sharma in 18 *Kan L. Rev.* 493, *supra,* where the authors set forth considerations which have been advanced in the academic world in favor of counsel at parole release hearings; but they follow up their discussion with a paragraph of particular pertinence here:

> These considerations do not necessarily indicate that providing counsel to prisoners in all parole release proceedings would be desirable at the present time. Certainly, any long-range plans for the improvement of the criminal justice system should include such a goal; for the present, however, to require counsel in all release hearings would probably do more harm than good. Because of the enormous volume of release proceedings which take place each year, the immediate effect of a counsel requirement would probably be to slow down the processing of cases, add to the workload of parole boards, and thereby reduce the numbers of prisoners placed on parole each year. Such a result, in the view of the writers, would be less desirable than the present practice of failing to provide counsel in release hearings. This view may be based upon a false assumption: experimentation and empirical evidence might show that the presence of counsel does not appreciably slow down the paroling process. However, if the assumption is correct, it would be important to increase the size of parole boards and their staffs and improve their administrative efficiency before requiring that counsel be provided in all release hearings. Short of providing counsel in every release hearing, it might be possible to improve present practices to some extent by allowing inmates to be represented by law students, prison social workers or caseworkers, or other nonprofessionals. 18 *Kan. L. Rev., supra* at 556–57.

See *Dorado v. Kerr,* 454 *F. 2d* 892, 898 (9 *Cir.* 1972); *but cf.* Parsons-Lewis, "Due Process in Parole-Release Decisions," 60 *Calif. L. Rev.* 1518, 1551–1553 (1972).

In line with the foregoing it is to be noted that the steps taken by the Parole Board towards overall improvement of the parole process have been significant and further steps may of course be duly undertaken. Thus the Board may consider recording, by tape or otherwise, the parole interview to the end that more effective review, both administratively and judicially, may be available. See O'Leary and Nuffield, *supra,* 8 *Crim. L. Bull.* at 664. Furthermore, the Board may consider extending its efforts and resources toward the goal of having counsel with restricted participation at the parole interview; such counsel might perhaps be attached to the Board itself or to the Public Defender's Office if the responsibilities of that office are appropriately enlarged by the Legislature (*N. J. S. A.* 2A:158A–1 *et seq.*). See Jacob and Sharma, *supra,* 18 *Kan. L. Rev.* at 599–600. We do not mean to suggest any departure from the precedential holdings that there is no due process right to such record or counsel or that we may be prepared to declare such right in the exercise of our constitutional supervisory powers over administrative agency proceedings. *Monks, supra,* 58 *N. J.* at 248–50. But we do mean to afford encouragement to continuing reexamination and continuing improvement of the entire parole release process by the Board itself (Dawson, *supra,* 1966 *Wash. U. L. Q.* at 303); all this, however, with full recognition that the Board must be afforded fair opportunity to observe the actual workings of its newly adopted procedures and such appropriate modifications and implementations as it may from time to time hereafter promulgate.

Our review of the statements of reasons and our examination of the inmates' files leave us with the belief that, in general, the Board has conscientiously fulfilled the mandate of *Monks* (58 *N. J.* 238) and has acted within its delegated discretionary authority and without arbitrariness. But since we have not dealt with the appeals individually we shall not at this juncture attempt to dispose of them with finality but shall instead remand them to the Appellate Division

for expeditious determination under the principles set forth in this opinion.

Remanded.

SULLIVAN, P. J. A. D., Temporarily Assigned (concurring) : I am in full agreement with the guidelines and principles for Parole Board hearings and decisions set forth in foregoing opinion. However, I think it should be made clear that judicial review of Parole Board matters is limited to a consideration of whether guidelines and principles have been substantially satisfied, and ordinarily will not involve a review of the merits of the Parole Board decision. As stated by Judge (now Justice) William J. Brennan, Jr. in *White v. Parole Board of State of N. J.,* 17 *N. J. Super.* 580, 586 (App. Div. 1952) :

"The grant or denial of parole is a matter for the exercise of proper judgment by the paroling authority and is not in any way a judicial function. *In re Fitzpatrick,* 9 *N. J. Super.* 511 (Cty. Ct. 1950), affirmed 14 *N. J. Super.* 213 (App. Div. 1951). Judicial review of an action such as that before us here is limited essentially to a determination whether it was taken within the statutory powers of the parole authority, properly applied. *In re O'Connor,* 130 *N. J. L.* 194 (Sup. Ct. 1943)."

Of course, if the Parole Board decision on the merits is palpably arbitrary or clearly erroneous, it would not be immune from judicial correction.

*For remandment*—Chief Justice WEINTRAUB, Justices JACOBS, HALL and MOUNTAIN, and Judges CONFORD, SULLIVAN and LEWIS—7.

*Opposed*—None.