**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3779-21

B.J.,

     Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

     Respondent.

_____

Argued February 28, 2024 – Decided March 26, 2024

Before Judges Accurso, Gummer, and Walcott-Henderson.

On appeal from the New Jersey State Parole Board.

Scott Michael Welfel, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Scott Michael Welfel, of counsel and on the briefs).

Christopher Josephson, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Christopher Josephson, on the brief).

PER CURIAM

B.J. has served over thirty-two years in prison for a double felony-murder conviction.[1]  He appeals from the March 30, 2022 final agency decision of the New Jersey State Parole Board (Board), denying his application for parole and imposing an eight-year (ninety-six-month) future eligibility term (FET).  We vacate the Board's decision and remand for a new hearing before the full Board and a new decision by the Board consistent with the Supreme Court's instructions in Acoli v. New Jersey State Parole Board, 250 N.J. 431 (2022).

## I.

B.J. is currently fifty-four years old.  In 1991, he and another man shot and killed two employees of a gas station they were robbing.[2]  A jury found B.J. guilty of second-degree conspiracy, N.J.S.A. 2C:5-2, and two counts each of: first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a); first-degree robbery, N.J.S.A. 2C:15-1; second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-

---

[1]  We use initials to protect appellant's privacy interests because the appeal requires that we discuss his mental-health records.

[2]  Neither B.J. nor the Board provided us with the trial transcripts, but the basic facts surrounding the murders were established at trial and are summarized in reports included in the record.

4(a); and third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). He subsequently pleaded guilty to third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(c), and third-degree receiving stolen property, N.J.S.A. 2C:20-7. He was sentenced to an aggregate term of life imprisonment, with a mandatory minimum term of thirty years.

B.J. became eligible for parole in August 2021. In anticipation of his parole eligibility, in February 2021, Jan Segal, Ph.D., conducted a mental health parole evaluation of B.J. As part of his evaluation, Dr. Segal conducted a Level of Service Inventory-Revised (LSI-R) assessment. Based on an LSI-R score of twenty-two, Dr. Segal determined B.J. presented "a moderate risk for recidivism with a 28% chance of re-arrest and a 17.1% chance of reconviction within two years of release." He described B.J.'s "Risk of Reoffending" as "Medium" and his "risk for future violence" to be "moderate." However, Dr. Segal concluded B.J.'s "likelihood" of "successfully completing a projected term of parole" was "generally fair."

In his written report, Dr. Segal characterized B.J.'s early adjustment to incarceration as "clearly problematic," but his "more recent adjustment [a]s satisfactory with clearly satisfactory motivation for programming." That finding is supported by B.J.'s prison record. During his incarceration, B.J. was

3

disciplined for eighteen infractions. Only five of those infractions were "asterisk" infractions, which are "prohibited acts considered to be the most serious violations, resulting in the most severe sanctions." Berta v. N.J. State Parole Bd., 473 N.J. Super. 284, 293 n.5 (App. Div. 2022). The vast majority of B.J.'s infractions occurred in the early years of his incarceration. Fourteen of the eighteen infractions occurred during the years 1992 through 1998. Of the four remaining infractions, only one of them was an asterisk infraction: the use of marijuana in 2009. According to B.J., he used the marijuana then in an effort to escape from reality after a family member had died. His most recent infraction, refusing to obey, occurred nearly ten years ago in 2014 when, according to B.J., he had an anxiety attack after being placed in a small transport van without being given anti-anxiety medicine to treat his documented claustrophobia.

Dr. Segal acknowledged B.J. "has earned his GED and has multiple, relevant programming accomplishments with more recent prosocial behavior noted." From February 2000 through May 2019, B.J. participated in the following programs: Human Biology (2000); Food Service Training Program (2001); African American History (2001); General Educational Development (2006); The Stock Market Game (2006); Moral Recognition Therapy (2004

through 2006); Living In Balance (2009); Thinking for a Change (2011); Workforce Learning Link (2012 through 2014); Helping Offenders Parent Effectively (2013); Cage Your Rage For Men (2013); Successful Employment and Lawful Living (2014); Barber Styling (2016); Your Role in the Green Environment LEED (2016); Smart Recovery (2017); Core Curriculum: Introductory Craft Skills (2017); Carpentry Level One (2017); Construction Site Safety Orientation (2017); Change Your Patterns and Change Your Life (2017 through 2018); and Focus on the Victim (2019).  B.J. was also employed during his incarceration, holding various jobs in the prison kitchen and in a clothing shop located in the prison.

Dr. Segal described B.J. as "present[ing] as generally stable with no evidence of a major mood, anxiety, or thought disorder."  According to Dr. Segal, B.J.'s age "is usually commensurate with decreased impulsivity, reactivity and likely lessened criminality."  Although he noted some "[a]ntisocial personality traits," Dr. Segal found B.J. did "not appear to be exhibiting any psychiatric concerns that require mental health treatment" and had "no acute psychiatric symptoms to be considered if [he] is released."  Noting B.J.'s claustrophobia, Dr. Segal recommended but did not require that he "seek counseling to help with breathing and improving self-control strategies to help

manag[e] himself if in enclose[d] spaces." He found B.J. had "developed some relevant work skills while" incarcerated and that his parole plans were "feasible but require confirmation."

Dr. Segal indicated B.J. had a history of cannabis use when he was a teenager; had "acknowledge[d] that at least some of his crimes were committed after having smoked marijuana"; had had only "one use related infraction," which had occurred in 2009; and had participated in a substance-abuse program while he was incarcerated.[3] In his list of "[r]ecommendations while in prison," Dr. Segal did not include participation in a substance-abuse program.[4] Nevertheless, Dr. Segal recommended that "[i]f paroled," B.J. participate in "[m]andatory random drug testing" and a "[r]egular 12-step program." Dr. Segal found B.J. "has cannabis use problems" even though the record contained no evidence of marijuana use for over ten years and B.J. had participated in a substance-abuse program after his "one use related infraction."

---

[3]  In fact, B.J. had participated in two substance-abuse programs while he was incarcerated.

[4]  He did not recommend B.J. participate in a substance-abuse program while incarcerated even though in the LSI-R assessment, Dr. Segal reported that B.J. had a "[d]rug problem, currently," scoring it as a one, meaning "[a] relatively unsatisfactory situation with a need for improvement."

A-3779-21

B.J. submitted to the Board his parole release plan. As part of the release plan, he submitted an "Inmate Statement" in which he acknowledged he had "no excuse for the devastation [he had] cause[d] these men['s] families an[d] at that age all [he had been] thinking about was instant gratification." In his statement, he credited prison for saving his life because "[i]t allowed [him] the opportunity to see how senseless, stupid, careless, arrogant, selfish, and inconsiderate [he] was as a young adult." If released, B.J. planned to live with his mother and two siblings and to pursue employment. The Board received letters from two business owners stating they would provide B.J. with employment on his release as well as three additional letters in support of his parole.

On June 28, 2021, a two-member panel of the Board held a parole-eligibility hearing. During the eligibility hearing, a panel member asked B.J. why at the age of twenty-one he had been "out there livin' that lifestyle and rippin' and runnin'." B.J. explained, "you're not really caring about the person or that person's property when you have a criminal mind set . . . . my whole lifestyle was being a criminal." The other panel member responded: "I mean it still is in a way, isn't it?" B.J. tried to answer him, stating "No. Because now, being I have learned from Focus on the Victim and – and any type of criminal

7

behavior my mind set - - ."  Before he could finish his answer, the panel member interrupted him, asking another question.

When a panel member asked him to explain why he had "just started to take [his] foot off . . . the accelerator like a couple of years ago,"[5] B.J. attempted to respond, stating:

> Again, I take -- I take full ownership.  But again, I had been trying to get -- I [had] been . . . gettin' in programs, I [have] been tryin'.  I mean alternate thinking, instead of -- instead of -- I have (indiscernible) because when I was (indiscernible) in South Woods, right (indiscernible) some of the guys were doin' (indiscernible).

But before he could finish his answer, the other panel member interrupted him and asked a different question.

After B.J. conceded marijuana use "was probably really big" in his life when he was "a young man," a panel member asked him if he meant "[u]p to and including in your 40s?" -- apparently referencing the 2009 infraction.  Before B.J. could respond to that question, the other panel member asked a different question.

---

[5] Presumably, the panel member meant to ask why B.J. had not stopped sooner having infractions while incarcerated.  Although the panel member seemed to think B.J.'s latest infraction had occurred "a couple of years ago," in fact his last infraction had occurred about six-and-one-half years ago.

A-3779-21

The two-member panel denied B.J. parole, issuing on June 28, 2021, an initial decision consisting of checkmarks on a standard checklist sheet with minimal commentary by the panel. In its decision, the panel checked that it had "determined a substantial likelihood exists that [B.J.] would commit a new crime if released on parole at this time." The panel checked six mitigating factors: participation in programs specific to behavior, participation in institutional programs, institutional reports reflect favorable institutional adjustment, attempt made to enroll and participate in programs but was not admitted, minimum custody status achieved or maintained, and commutation time restored.

The panel checked as reasons for its denial several factors related to the crimes for which he was incarcerated, factors related to his failure to remain crime-free during a prior probationary period that had taken place decades before, his institutional infractions, Dr. Segal's report, and "insufficient problem(s) resolution," which was based on findings of "lack of insight into criminal behavior" and a failure to "sufficiently address[]" a "substance abuse problem." The panel concluded B.J. "is progressing but still shows a need for more programming, maturity and change of attitude towards laws." The panel referred the case to a three-member panel "for the establishment of a FET that may be in excess of administrative guidelines."

9

After receiving the decision, B.J. submitted a four-page letter to the Board, expressing his remorse for the pain he had caused the victims' family members, detailing his efforts at redemption, and expressing his willingness to take or retake any programs.

The two-member panel issued an amended decision dated August 13, 2021, "to clarify the factors that were in the record . . . and that were relied upon . . . ."  The panel added factors related to B.J.'s institutional infractions and the failure of his prior incarcerations and probationary periods, which had taken place over thirty years before the panel issued its decisions, to deter criminal behavior.

On October 6, 2021, the three-member panel convened and set a ninety-six-month FET.  It issued a written explanation of its decision on November 9, 2021.  Citing the same reasons for its decision as the two-member panel had cited for denying parole, the panel concluded "the factors supporting the denial of parole, collectively, are of such a serious nature as to warrant the establishment of a future eligibility term which differs from the presumptive term of twenty-seven months."

The three-member panel faulted B.J. for his "lack [of] insight into [his] criminal behavior" and for "not sufficiently address[ing his] substance abuse

problem." The panel concluded B.J. had a "substance abuse problem" even though a recent case assessment was devoid of any finding he had a substance-abuse problem. On the assessment, the "occasional use of cannabis and alcohol" was noted, substance abuse was found not to be a part of B.J.'s criminal history, and the offense for which he was incarcerated was deemed not to have been committed while he was under the influence. The assessment contained a checklist of "factors considered," similar to the checklist contained in the two-member panel's decision; "substance abuse problem has not been sufficiently addressed" was not checked on the case assessment. The two-member and three-member panels apparently did not consider the findings made in the case assessment but instead relied on Dr. Segal's report, which, at best, contained mixed and contradictory information concerning his views of B.J.'s purported substance abuse.

Regarding B.J.'s purported lack of insight into his criminal behavior, the three-member panel focused on his interview by the two-member panel during the parole-eligibility hearing. The three-member panel stated B.J. had "indicated to the [two-member] panel that [he] do[es] not 'blame them (victims) for they tried to stop the armed robbery so I wouldn't take any of the money.'" We do not see that language in the transcript of the eligibility hearing.

11

According to the three-member panel, when the two-member panel asked B.J. if he still thought "in that manner," apparently meaning with a criminal mind set, B.J. answered, "no, because now being I've done Focus On the Victim." According to the transcript, B.J. had started to answer, saying "No. Because now, being I have learned from Focus on the Victim and - - and any type of criminal behavior my mind set --" but was interrupted by another question from a panel member and was thereby prevented from finishing his answer.

The three-member panel stated B.J. had "side stepped" "pointed or reflective" questions from the two-member panel about his "violent past" and that, regarding the murders for which he had been convicted, B.J. had "inferred [sic] that once the victims rushed towards [him] the only option was to shoot them." But B.J. didn't actually say to the two-member panel his "only option" was to shoot the victims.

Regarding B.J.'s plan to reside with his mother, the three-member panel incorrectly described his mother as "disabled and in a wheelchair 'she's not able to defend herself or take care of herself.' Also living at the residence are your sister and brother, who assist your mother daily." But B.J. had told the

12

two-member panel his sister, not his mother, was disabled and confined to a wheelchair.[6]

The three-member panel found B.J. had "present[ed] as not understanding the dynamics to [his] criminal thinking" because he had failed to:

> articulate any specifics about [his] criminal mindset. [He] did not articulate the genesis of [his] criminal thinking, [his] motivations to behave in a criminal manner beginning as a juvenile or what innate details to [his] personality defects impelled [him] to continue to behave in a criminal manner even after interaction with the criminal justice system.

The panel further concluded B.J. had failed to make "adequate progress in the rehabilitative process to ensure criminal behavior and decision-making does not occur again in the future."

The three-member panel briefly referenced in its decision B.J.'s "participation in programs," identifying specifically only four of the programs he had successfully completed. The panel made no mention of the unrebutted letters others had submitted in support of his parole.

Citing specifically B.J.'s infraction history and its findings that he lacked "understanding [of] the dynamics to [his] criminal thinking" and had failed to

---

[6]  The panel issued an amended decision correcting that error after B.J. had appealed the decision, pointing out that error.

A-3779-21

make "adequate progress in the rehabilitative process," the three-member panel concluded "the factors supporting the denial of parole, collectively, are of such a serious nature as to warrant the establishment of a [FET] which differs from the presumptive term . . . ." The panel imposed a ninety-six-month FET, over three times the presumptive FET of twenty-seven months. See N.J.A.C. 10A:71-3.21(a)(1) (setting a presumptive FET of twenty-seven months for an inmate serving a sentence for murder).

B.J. administratively appealed the two-member panel's parole denial and the three-member panel's FET decision to the full Board. In his appeal, B.J. contended the panels had failed to consider or give appropriate weight to certain material facts, including his age and immaturity at the time of the murders, that most of his institutional infractions were classified as less serious and occurred during the early part of his incarceration, his last serious infraction occurred in 2009, he had completed numerous courses, he had taken responsibility for his criminal actions, and he had a parole plan that included living with his able-bodied mother and promises of employment.

The Board considered his appeal during a meeting held on March 30, 2022, and issued a written decision that day affirming both decisions. The Board concurred in the panels' findings, including that B.J. "still lacks insight into his

criminal behavior and has not sufficiently addressed his substance abuse problem." This appeal followed.

On appeal, B.J. argues the Board's findings, including that he was substantially likely to commit a crime if released, were not supported by substantial evidence in the record. B.J. also challenges the ninety-six-month FET as an excessive deviation beyond the standard twenty-seven-month FET. A review of the record convinces us the Board did not provide B.J. with a fair hearing. We therefore vacate the Board's decision and remand for a new hearing before the full Board.

## II.

An appellate court's review of Board decisions is limited and deferential. Acoli, 250 N.J. at 439. Board decisions are "highly 'individualized discretionary appraisals.'" Trantino v. N.J. State Parole Bd. (Trantino VI), 166 N.J. 113, 173 (2001) (quoting Beckworth v. N.J. State Parole Bd., 62 N.J. 348, 359 (1973)). Accordingly, courts overturn Board decisions only if they are arbitrary and capricious. Ibid. In that regard, Board factual findings will not be disturbed if they "could reasonably have been reached on sufficient credible evidence in the whole record." Hare v. N.J. State Parole Bd., 368 N.J. Super. 175, 179 (App. Div. 2004) (citing Trantino VI, 166 N.J. at 172). We accord that deference

because "[t]he decision of a parole board involves 'discretionary assessment[s] of a multiplicity of imponderables.'" Trantino VI, 166 N.J. at 201 (Baime, J., dissenting) (second alteration in original) (quoting Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 10 (1979)).

"The discretionary power exercised by the Parole Board, however, is not unlimited or absolute." Acoli, 250 N.J. at 455. "[W]hen a parole decision is so far wide of the mark or so manifestly mistaken under the governing statutory standard, intervention is required in the interests of justice." Ibid. (citing Trantino VI, 166 N.J. at 192). A Board decision will not be sustained if it violates legislative policy, is not supported by substantial evidence in the record, or "could not reasonably have been made on a showing of the relevant factors." Ibid. (quoting Trantino v. N.J. State Parole Bd. (Trantino IV), 154 N.J. 19, 24 (1998)).

The Parole Act of 1979, N.J.S.A. 30:4-123.45 to -123.76, which governs B.J.'s parole, states a prisoner "shall be released on parole at the time of parole eligibility, unless [it is shown] by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the law of this State if released on parole at such time." Ibid. (quoting Trantino VI, 166 N.J. at 126 (alternations and omissions in original) (quoting N.J.S.A. 30:4-123.53

16

(1979))). Thus, when an inmate becomes eligible for parole, there is a "presumption in favor of parole," In re Application of Trantino (Trantino II), 89 N.J. 347, 356 (1982), and the State must "prove that the prisoner is a recidivist and should not be released," Acoli, 250 N.J. at 456 (quoting N.J. State Parole Bd. v. Byrne, 93 N.J. 192, 205 (1983)). "Assessing the risk that a parole-eligible candidate will reoffend requires a finding that is more than a mere probability and considerably less than a certainty." Acoli, 250 N.J. at 456. "Only when the risk of the reoffending rises to 'a substantial likelihood' may a parole-eligible inmate be denied parole." Ibid. (quoting N.J. State Parole Bd. v. Cestari, 224 N.J. Super. 534, 550 (App. Div. 1988)).

Under the 1979 Parole Act, the Board must assess numerous factors in determining whether the person is ready for parole. Ibid. N.J.A.C. 10A:71-3.11(a) states the grant or denial of parole must "be based on the aggregate of all pertinent factors." That regulation sets forth a list of twenty-four factors that the Board shall consider, in addition to other factors the Board may deem relevant. Id. at 457 (citing N.J.A.C. 10A:71-3.11(b)).

The Court in Acoli recently explained:

> Some of those factors include: facts and circumstances related to the underlying crime; offenses and disciplinary infractions committed while incarcerated; participation in institutional programs and academic or

17

vocational education programs; documentation reflecting personal goals, personal strengths or motivation for law-abiding behavior; mental and emotional health; parole plans; availability of community resources or support services; statements by the inmate reflecting on the likelihood that he [or she] will commit another crime; the failure to rehabilitate; history of employment and education; and statement or testimony of any victim.

[Ibid.]

Although parole hearings are "informal," N.J.A.C. 10A:71-3.13(a), the Board must follow certain procedures in conducting the hearings and the inmates have certain rights in connection with the hearings. For example, "[t]he hearing officer, Board panel or Board shall receive as evidence any relevant and reliable documents or testimony," N.J.A.C. 10A:71-3.13(c), and "[t]he inmate shall have the right to rebut any evidence and shall have the right to present evidence on his or her own behalf," N.J.A.C. 10A:71-3.13(e).

The hearing officer, Board panel, or Board must base a parole decision "solely on the evidence presented at the hearing," N.J.A.C. 10A:71-3.13(j), including "material supplied by the inmate and reports and material which may be submitted by any persons or agencies which have knowledge of the inmate," N.J.A.C. 10A:71-3.11(a). They may not rely on selective portions of the record

18

that support a determination of likely recidivism while overlooking or undervaluing conflicting information. Trantino VI, 166 N.J. at 189-90.

The hearing officer, Board panel, or Board must consider the applicable factors enumerated in N.J.A.C. 10A:71-3.11(b) in making a parole decision. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 561 (App. Div. 2002). One of those factors is "[p]articipation in institutional programs which could have led to the improvement of problems diagnosed at admission or during incarceration," including "academic or vocational education programs" and "work assignments that provide on-the-job training . . . ." N.J.A.C. 10A:71-3.11(b).

Even giving the Board's and panels' decisions all the deference they are due, we are constrained to remand this matter for a new hearing. Having reviewed the record, we conclude those decisions resulted from an unfair process in which B.J. did not have a full opportunity to respond to the panel member's questions and the Board and its members selectively relied on Dr. Segal's internally-inconsistent evaluation while failing to consider other information. We are convinced the panels' and the Board's conclusions that defendant "lacks insight into his criminal behavior and has not sufficiently addressed his substance abuse problem" were reached through a process that did

not give defendant a fair opportunity to demonstrate otherwise – not that it was his burden to do so. See Acoli, 250 N.J. at 456 (finding it is the State's burden "to prove that the prisoner is a recidivist and should not be released" (quoting Byrne, 93 N.J. at 205)).

The Board's and the panels' determination that B.J. lacked insight into his criminal behavior appears to be based largely on the questioning conducted of him by the two-member panel during the parole eligibility hearing. The transcript of that proceeding demonstrates the panel members repeatedly interrupted B.J. while he was attempting to respond to questions that went directly to the issue of his insight into his criminal behavior. We are left wondering if the panel members and the Board would have been satisfied with his responses had the panel members permitted him to complete his answers to their questions instead of repeatedly interrupting him. We recognize the informal nature of the proceedings before the Board, N.J.A.C. 10A:71-3.13(a), but an inmate has the right to present evidence on his own behalf, N.J.A.C. 10A:71-3.13(e), especially in response to critical questions raised by the panel members.

Without any explanation of how and whether they had considered and addressed the inconsistencies within Dr. Segal's evaluation and between his

20

evaluation and other information in the record, it isn't possible to make sense of the Board's and panels' conclusion B.J. has a substance-abuse problem he has failed to address sufficiently. Dr. Segal, the Board, and the panels concluded B.J. has a substance-abuse problem even though: the record is devoid of any evidence B.J. had used marijuana during the twelve years before his parole-eligibility date, he had not incurred any "use related" infractions during the first seventeen years of his incarceration, the one and only "use related" infraction had occurred in 2009, he had participated in two substance-abuse programs since that infraction, on the recent case assessment "substance abuse problem has not been sufficiently addressed" was not checked, and even Dr. Segal had not recommended that B.J. participate in a substance-abuse program while incarcerated. If B.J. had an insufficiently-addressed substance-abuse problem, wouldn't Dr. Segal have recommended he participate in a substance-abuse program while incarcerated?

With no apparent effort to address those inconsistencies in the record, we are left with the conclusion the Board and the panels improperly relied on selective portions of the record that support a determination of likely recidivism while overlooking or undervaluing conflicting information. Trantino VI, 166 N.J. at 189-90. And we have reason to believe the Board and the panels did so

21

in other ways as well.  For example, the three-member panel made scant mention in its decision of the programs B.J. had successfully completed; neither the two-person nor the three-person panel mentioned the unrebutted letters others had submitted in support of his parole.  The limited or non-existing references made to those programs and letters does not allow us to review and conclude the panels and the Board conducted the analysis required by the 1979 Parole Act.  And although the Board can and should consider B.J.'s institutional infractions, it also should consider the fact that the vast majority of those infractions, particularly the serious infractions, occurred in the early part of his incarceration.  It isn't clear from their decisions that the Board or panels gave any consideration to that fact.

The Board's and the panels' focus on B.J.'s institutional infractions, his juvenile record, his commission of crimes while on probation decades ago, and the nature of the crimes for which he is currently incarcerated makes us concerned that the Board and the panels improperly considered the punitive aspects of B.J.'s sentence, see Trantino II, 89 N.J. at 372, instead of "focus[ing their] attention squarely on the likelihood of recidivism."  McGowan, 347 N.J. Super. at 565.

We are equally unconvinced the Board and the panels applied the appropriate standard in rendering their decisions. Dr. Segal determined B.J. presented "a moderate risk for recidivism with a 28% chance of re-arrest and a 17.1% chance of reconviction within two years of release" and described B.J.'s "Risk for Reoffending" as "Medium." However, he also concluded B.J.'s "likelihood" of "successfully completing a projected term of parole" was "generally fair." How can someone with a "generally fair" likelihood of "successfully completing a projected term of parole" be deemed at the same time to have a "Medium" risk of reoffending? Is a "moderate risk for recidivism" the equivalent of "a substantial likelihood" of reoffending? We respectfully remind the Board that "[o]nly when the risk of reoffending rises to 'a substantial likelihood' may a parole-eligible inmate be denied parole." See Acoli, 250 N.J. at 456 (quoting Cestari, 224 N.J. Super. at 550).

For all of those reasons, we vacate the Board's decision and remand the matter to the Board, directing that within sixty days the Board conduct a new hearing and render a new decision that addresses the concerns raised in this opinion and the various factors set forth in the Board's regulations and is consistent with the Supreme Court's instructions in Acoli, 250 N.J. 431.

In light of our remand, we need not engage in an excessive analysis of the ninety-six-month FET imposed by the Board. After denying parole, the Board must establish an FET. N.J.A.C. 10A:71-3.18(a)(2). When the Board denies parole for a person serving a life sentence, the standard FET is twenty-seven months. N.J.A.C. 10A:71-3.21(a)(1). The Board, however, can exceed the FET guideline if it determines that the presumption "is clearly inappropriate due to the inmate's lack of satisfactory progress in reducing the likelihood of future criminal behavior." N.J.A.C. 10A:71-3.21(d).

The three-member panel that established the eight-year FET did not adequately articulate the reasons for imposing an FET that was over three times the presumptive FET. It simply parroted the findings of the two-member panel without explaining why those findings justified an FET that significantly exceeded the presumptive FET. Consequently, on remand, if the Board decides to deny B.J. parole, it must also reconsider the appropriate FET and explain the reasons for an FET beyond the statutory presumption of twenty-seven months.

For the reasons outlined above, we vacate the March 30, 2022 Board decision, remand the matter to the Board, and direct that within sixty days the full Board conduct a new hearing and render a new decision. We direct the Board to give B.J. a fair opportunity to respond fully to any questions posed by

24

Board members and "to rebut any evidence and . . . to present evidence on his . . . own behalf," consistent with N.J.A.C. 10A:71-3.13(e). We also direct the Board to base its reconsideration of this case on the facts and the governing law, which includes, as set forth above (1) a presumption in favor of parole and (2) the burden on the State to prove, by a preponderance of the evidence, that there is a substantial likelihood the inmate will commit a crime if released on parole. The Board shall issue a complete and meaningful explanation of the reasons for whatever action it takes.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3779-21