**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2117-22

M.B.,

     Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

     Respondent.

_____

Argued October 8, 2024 – Decided August 12, 2025

Before Judges Sumners and Susswein.

On appeal from the New Jersey State Parole Board.

Jennifer Brooke Condon argued the cause for appellant (Center for Social Justice, Seton Hall Law School, attorneys; Jennifer Brooke Condon, of counsel and on the briefs; Fatima M. Abughannam, Gabriella M. Andrews, Patricia Calderone, and Labiba Salim, appearing pursuant to Rule 1:21-3(b), on the briefs).

Christopher C. Josephson, Deputy Attorney General argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Christopher C. Josephson, on the brief).

PER CURIAM

Inmate M.B. appeals from the February 23, 2023 final decision of the Parole Board (Board) affirming the Board's panel decision to deny him parole and impose a thirty-six-month future eligibility term (FET). In 1993, M.B. was convicted of murdering his wife and was sentenced to a life term with a mandatory minimum period of thirty years without parole. He became eligible for parole in August 2022 at the age of seventy. M.B. asserts the Board committed numerous errors, but his central arguments are that the Board improperly relied on his "lack of insight" into his criminal behavior, erred in finding that he failed to sufficiently address his substance abuse problem, and did not sufficiently consider his age and family support.

At oral argument before us, we were informed that during the pendency of this appeal, M.B. served the FET. On October 15, 2024, the Deputy Attorney General informed us that the full Parole Board again denied M.B. parole and imposed another thirty-six-month FET.

On December 31, 2024, M.B. moved to have us consider the October 15 decision as part of the present appeal, claiming the Board committed the same errors on a nearly identical record. His motion asked us to consider both parole denials together, even though the 2023 denial was a final agency decision and

the 2024 decision was not. He asked us to waive the administrative exhaustion requirement with respect to the latest decision, arguing that waiting for an administrative appeal is unnecessary in this case because "the [f]actual [r]ecord [i]s [f]ully [d]eveloped and [l]argely [s]tatic."

We denied defendant's motion, explaining:

> Because M.B. has not filed another appeal or been granted leave to appeal an interlocutory decision of the [Board] regarding denying him parole and imposing a new FET since the filing of A-2117-22, there is no appeal that can be consolidated with A-2117-22. Should M.B. seek leave to appeal an interlocutory Parole Board decision, he must include all documents pertaining to that decision.

We have since confirmed that M.B. has not sought leave to appeal the Board's October 2024 decision. Because we do not have the records pertaining to that decision, other than the notice of decision, we have no way of determining whether the Board made the same reversible errors as M.B. claimed in his motion. We note that neither party argues that the present appeal is moot. Accordingly, we proceed to decide this appeal without considering the developments following oral argument.

Although we might have reached a different conclusion regarding the risk that M.B. will commit a new crime, given the deferential standard of our review of Parole Board decisions, we affirm. Our conclusion that the Board did not

3

abuse its discretion in rendering its February 2023 decision is subject, however, to a caveat. If the Board were to rely on the same circumstances to repeatedly deny M.B. parole, that might evince a design to permanently deny parole in violation of the statutory framework. Cf. Berta v. N.J. State Parole Bd., 473 N.J. Super. 284, 321 (App. Div. 2022) (distinguishing the "litany of denials" in Acoli v. N.J. State Parole Bd. (Acoli III), 250 N.J. 431 (2022) and explaining that because "this is only the second time that Berta was denied parole . . . , we choose to provide the Board an opportunity to explain why, considering the totality of relevant circumstances militating in favor of parole, Berta's ongoing protestation of innocence supports the conclusion . . ."). That concern is not ripe in this matter because, as noted, we are addressing only the Board's first denial.

## I.

We discern the following pertinent facts and procedural history from the record. In 1992, M.B. stabbed his wife multiple times at her workplace with a hunting knife he purchased earlier that day. The jury found M.B. guilty of first-degree murder, N.J.S.A. 2C11-3(a)(1)/(2); unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); and possession of a weapon by a previously-convicted person, N.J.S.A 2C:39-7. He was sentenced to an aggregate term of life imprisonment

with a mandatory minimum of thirty years without parole.  He became eligible for parole on August 1, 2022.

On April 14, 2022, a hearing officer conducted an initial hearing and referred the matter to a Board panel for a hearing pursuant to N.J.A.C. 10A:71-3.15(b).  M.B. provided the hearing officer with forty-nine certificates of completed programs, three psychological reports, a written statement, and five letters of support from relatives and an attorney who worked with him on an unrelated civil matter.

In front of the Board panel, M.B. recounted the "toxic" relationship he had with his wife and how often they argued over his two children from a previous relationship.  He explained:

> I'm totally responsible for . . . murdering my wife.
> But . . . there wasn't a lot of violence in our relationship.
>
> . . . .
>
> [W]hat used to happen was I used to rent a U-Haul truck and pack them up [(referring to his and his two children's items)] . . . and move them to my ex-wife's house because she would take care of them, make sure they got to school, and this, that, and the other thing.

Relatedly, in a letter submitted to the Board on February 14, 2022, M.B. acknowledged, "[n]ot only did I murder her, I took her life in a brutal and bloody

manner; thoughtlessly and with no regard for her, her family, or the consequences of my actions." He also admitted that he "was in denial for approximately the first [eleven] years of [his] incarceration" but has since accepted "full responsibility" for his wife's murder and "all the destructive choices [he has] made throughout [his] life."

M.B. has a well-documented history of drug and alcohol abuse. He claimed at the hearing that he has been sober from drugs and alcohol since 2004, when he was disciplined for possession.

The record also shows that defendant had a significant adult criminal history prior to the murder. Between 1971 to 1989, he was convicted for assault, assault and battery, theft by deception, disorderly conduct, resisting arrest, possession of a handgun without a permit, and aggravated assault.

M.B. served in the United States Marines from 1972 to 1975 until his honorable discharge. He reports working in computer operations/data entry, security at a casino, warehouse operations, a fire department, the county welfare department, and occasionally for a hot dog vendor. In addition, he earned his G.E.D. and college credits from a local community college. M.B. has also participated in several behavioral and rehabilitative programs spanning 1997 to 2022.

6

The record details M.B.'s history of institutional infractions. While incarcerated, he committed nine infractions and lost 970 days' commutation time. His record includes five "asterisk" (i.e., serious) infractions.[1] The most recent occurred in April 2014, for assaulting any person (*.002) and conduct which disrupts the orderly operation of the prison (*.306). In addition, he has infractions in 2001 for possession of a weapon (*.202) and use of narcotics (marijuana) in 2004 (*.203/.204). Other infractions occurred earlier and were less serious such as refusing to work/accept assignment in 1996 (.254), possession of unauthorized clothing in 1998 (.212), and unauthorized possession and give/take from another in 2002 (.210/754).

The panel cited the following mitigating factors in its June 9, 2022 decision: (1) infraction free since last panel; (2) participation in program(s) specific to behavior; (3) participation in institutional program(s); (4) attempt made to enroll and participate in program(s) but was not admitted; and (5) letters of support.

---

[1] Under the New Jersey Department of Corrections' regulations, "asterisk offenses" are considered the most serious violations. See Hetsberger v. N.J. Dep't of Corr., 395 N.J. Super. 548, 556 (App. Div. 2007); N.J.A.C. 10A:4-4.1(a).

A-2117-22

The panel found the following reasons for denial: (1) the facts and circumstances of offense(s) and specifically, "[m]urder"; (2) prior offense record is extensive; (3) offense record is repetitive; (3) prior offense record noted; (4) nature of criminal record increasingly more serious; (5) prior opportunities on community supervision (probation/parole) failed to deter criminal behavior; (6) prior incarceration(s) did not deter criminal behavior; (7) institutional infractions (numerous/serious in nature/loss commutation time), noting the most recent occurred on April 20, 2014; (8) the risk assessment evaluation where M.B. scored a thirty-eight; and (9) insufficient problem resolution(s) as demonstrated by his interview and pre-parole report. Specifically with respect to insufficient problem resolution, the Board panel found that M.B. had a "lack of insight into his criminal behavior," that his "substance abuse problem has not been sufficiently addressed," and that he "has not yet addressed fully his violent rage and anger on the street and in prison." The panel stated, "[m]ore work is need[ed] on his self-control and substance abuse history and lifestyle choices."

On June 12, 2022, M.B. administratively appealed the Board panel decision. On August 10, the panel vacated its June 9 decision based on errors and omissions and scheduled a de novo hearing. Specifically, the panel noted

with respect to aggravating factors that its June 9 decision omitted that M.B. had been "[c]ommitted to incarceration for multiple offenses" and "[c]ommitted [a] new offense while on community supervision (probation) but status not formally terminated." The panel found that "[o]n 04/24/85 [M.B.] committed the offense of [a]ggravated [a]ssault while on probation. There is no indication [M.B.'s] probation was formally terminated." Further, it stated that the initial decision omitted that its finding of "[i]nsufficient problem(s) resolution" was based upon "confidential material/professional report."

With respect to mitigating factors, the Board panel noted that it should not have considered "[i]nfraction-free since last panel" because this was M.B.'s first parole release hearing. Further, the panel explained that "[i]nstitutional reports reflect favorable institutional adjustment" was incorrectly omitted as a mitigating factor. The panel amended the initial case assessment. For prior adjudications/convictions, it noted seven as an adult and one prior county incarceration. For the summary of prior adjudications/convictions, the panel removed terroristic threats, fraud, and forgery. It also changed the loss of commutation to 970 days, added "[c]ommitted to incarceration for multiple offenses" to the factors considered, and noted that M.B. committed new offenses while on community supervision (probation) but status was not formally

terminated/revoked. Finally, the panel added detention to M.B.'s institutional infractions.

A two-member Board panel held a new hearing on November 10, 2022, after which it again denied parole and recommended a thirty-six-month FET. When asked at the second hearing if he ever struck his wife during an argument before the fatal stabbing incident, M.B. admitted that he had. He also recounted that:

> It was a . . . disagreement. And somebody had called . . . her on the phone. And she got on the phone. And I don't know what that was all about. But all of sudden that she—you know, everything went south. I came back to pick up the $155 (sic) . . . . I was told that she had called the cops on me. That she didn't want me there . . . at the beauty parlor. And I just kind of like—I don't know, I just kind of snapped.

M.B. added:

> Because I didn't know everything—I could just see my whole world crumbling. . . . I guess I was just too emotionally immature to deal with it like in . . . a normal way or in an adult way. I don't know how you would . . . call that . . . .

M.B. also admitted that drugs played a role in his violent crimes, stating "[a]ll of my violent actions were based on my heroin addiction and the lifestyle that I was involved in." He testified that he stopped using heroin in 1985.

A-2117-22

In its new decision, the panel noted mitigating factors include M.B.'s participation in programs specific to behavior and institutional, institutional reports reflecting favorable institutional adjustment, a positive interview, multiple letters of support, and that M.B. displayed remorse, insight, and honesty.

The panel nonetheless denied parole for the following reasons: (1) the "[f]acts and circumstances of the offense(s)," specifically "[m]urder"; (2) "[p]rior offense record is extensive"; (3) "[o]ffense record is repetitive"; (4) "prior offense record is noted"; (5) "[n]ature of criminal record [became] increasingly more serious"; (6) "[c]ommitted to incarceration for multiple offenses"; (7) he committed a new offense while on probation but his status was not formally revoked/terminated; (8) "[p]rior oppurtunit[ies]" on prior probation and parole "failed to deter criminal behavior"; (9) "[p]rior incarceration(s) did not deter criminal behavior"; (10) his institutional infractions that were "numerous" and "serious in nature" which resulted in loss commutation time, confinement in detention, and administrative segregation, noting his last infraction was on April 20, 2014; (11) "[i]nsufficient problem(s) resolution" as demonstrated by his interview, pre-parole report, and confidential

11 <span>A-2117-22</span>

material/professional report; and (12) his score of thirty-eight on the risk of recidivism assessment.

In addition to checking the boxes for "lack of insight into his criminal behavior" and "substance abuse problem has not been sufficiently addressed," the Board panel found that M.B. "has not shown [he] significantly addressed his decision[-]making skills or addressed his violent behavior . . . while incarcerated and while living with his family. [M.B.] needs to continue to work on his substance abuse and focus on making better lifestyle decisions."

M.B. again appealed to the full Board claiming the panel's decision reflected a "highly selective focus on only those factors that would justify its denial of parole," "fail[ed] to consider material facts and evidence favorable to granting parole" which "undermin[es] its decision," and did not "show a substantial likelihood that [M.B.] will commit a crime if released on parole." He reasoned that:

> [T]he [p]anel overlooked and/or undervalued hundreds of hours [M.B.] spent in rehabilitation programming; hundreds of hours in vocational programs and on-the-job training in the State use [i]ndustries; his advanced age and how it is related to the likelihood he will re-offend; his physical health; his family support and support from the [New Jersey] Veterans Affairs.

On February 22, 2023, the Board affirmed the panel's November 2022 decision to deny parole and establish a thirty-six-month FET. In its final decision, the Board acknowledged that M.B. exhibited "some insight into the seriousness of [his] actions and had remorse for what happened, but when asked why the argument escalated into [M.B.] stabbing [his] wife numerous time [he was] unable to provide insight into why [he] reacted the way [he] did."

The Board also acknowledged M.B.'s program participation and institutional program efforts but concluded the panel "appropriately determined [he] exhibited insufficient problem resolution[.]" The Board explained that after the hearing the panel found that M.B. "gained little insight from these programs" and his "participation does not negate the fact that [he] still lack[s] insight into [his] criminal behavior."

The Board noted that M.B.'s age and health issues were discussed during the panel hearing but concluded that his age "is not [a] dispositive factor of whether the offender is suitable for parole release." Additionally, the Board rejected M.B.'s contention regarding the sufficiency of his rehabilitation, explaining that "while acknowledging the serious consequences of [his] criminal activity and substance abuse is a step towards rehabilitation, it represents only an initial effort at rehabilitation." The Board concluded that M.B.'s

13

"maladaptive behavior is deeply rooted as evidenced by [his] extensive criminal record and [his] commission of numerous institutional infractions[.]"

This appeal followed. To summarize the numerous issues M.B. raises on appeal, we reproduce the point headings from his brief:

POINT I

THE BOARD'S DECISION DENYING PAROLE WAS ARBITRARY, CAPRICIOUS, UNREASONABLE, AND NOT IN ACCORDANCE WITH THE LAW BECAUSE THE RECORD COULD NOT REASONABLY SUPPORT A FINDING THAT A SUBSTANTIAL LIKELIHOOD EXISTS THAT [M.B.] WILL COMMIT ANOTHER OFFENSE—THE ONLY BASIS FOR OVERCOMING N.J.S.A. 30:4-123.53(a)'S MANDATE OF PAROLE.

    A. Because "Lack of Insight" Is Not a Factor Within N.J.A.C. 10A:71-3.11(b), and Is Otherwise Vague and Malleable, The Board Erred by Citing It as a Reason For Parole Denial.

    B. The Board's Contradictory Conclusions as to [M.B.]'s Insight and Rehabilitation Are Patently Irrational and Fail to Demonstrate a Substantial Likelihood of Reoffending.

POINT II

THE BOARD'S REASONING THAT [M.B.] NEEDS TO FURTHER ADDRESS HIS PAST SUBSTANCE ABUSE IS UNREASONABLE AND UNSUPPORTED BY THE RECORD WHEREHE HAS BEEN SOBER FOR DECADES AND COMPLETED EXTENSIVE SUBSTANCE ABUSE PROGRAMS AND

14

TREATMENT OVER [THIRTY] YEARS OF INCARCERATION.

POINT III

THE BOARD'S CONCLUSION THAT [M.B.] LIKELY TO REOFFEND CANNOT STAND BECAUSE IT FAILED TO WEIGH CRITICAL EVIDENCE IN THE RECORD RELATED TO HIS AGE, POOR HEALTH, AND FAMILY SUPPORT THAT SHOW HIS LOW LIKELIHOOD OF REOFFENDING.

> A. The Board Erred by Failing to Consider [M.B.]'s Age and Life-Limiting Health Conditions as Significant Factors Showing He is Unlikely to Reoffend.

> B. The Board Disregarded and Minimized Relevant and Compelling Evidence in the Record Demonstrating [M.B.]'s Positive Familial Relationships That Further Demonstrate His Unlikelihood of Reoffending.

POINT IV

THE BOARD'S NEGATIVE FINDINGS ARE UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND ERRONEOUSLY RESTED ALMOST EXCLUSIVELY ON THE PAST IN DISREGARD OF THE PAROLE ACT'S FORWARD[-]LOOKING ASSESSMENT.

> A. The Board Erred by Relying on the Facts and Circumstances of the Offense as a Reason for Denial Without Showing That [M.B.]'s Disciplinary Is Substantially Likely to Reoffend.

15

B. The Board's Erred by Failing to Consider [M.B.]'s Disciplinary History in Context, When Most Infractions Occurred Early in His Incarceration and Were Non-Violent.

C. The Board's Overreliance upon [M.B.]'s Pre-incarceration Conduct Arising from Substance Abuse Disorder Does Not Demonstrate a Substantial Likelihood to Reoffend.

D. The Board Erred by Relying on [M.B.]'s Faulty LSI-R score to Conclude that he Demonstrates a Substantial Likelihood to Reoffend.

E. The Board Erred by Relying on the Confidential Psychological Evaluation to Deny [M.B.] Parole When the Evaluation Contained Contradictions and Is Inconsistent with the Record.

POINT V

THE DENIAL OF A CONFIDENTIAL PYSCHOLOGICAL REPORT VIOLATED [M.B.]'S DUE PROCESS RIGHTS.

II.

We begin our analysis by acknowledging the governing legal principles. "As a general matter, [an appellate court] will disturb an agency's adjudicatory decision only if [it] determines that the decision is 'arbitrary, capricious or unreasonable' or is unsupported 'by substantial credible evidence in the record as a whole.'" Berta, 473 N.J. Super. at 302 (quoting Henry v. Rahway State

16

A-2117-22

Prison, 81 N.J. 571, 579-80 (1980)). In making that determination, the court will examine:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Id. at 302-03 (quoting In re Carter, 191 N.J. 474, 482-83 (2007)).]

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007). "With respect to the Parole Board's expertise, . . . one of its core functions is to evaluate inmates and to make reasoned predictions as to how they will perform if released from prison under the Board's supervision." Berta, 473 N.J. Super. at 302.

However, we stress that "[the appellate court's] review is not 'perfunctory,' nor is [the court's] 'function . . . merely [to] rubberstamp an agency's decision[.]'" Blanchard v. N.J. Dep't of Corr., 461 N.J. Super. 231, 239 (App. Div. 2019) (omission in original) (second and third alteration in original) (quoting Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186, 191 (App. Div. 2010)). Rather, we

17

are "constrained to engage in a 'careful and principled consideration of the agency record and findings.'" Ibid. (quoting Williams v. Dep't of Corr., 330 N.J. Super. 197, 204 (App. Div. 2000)).

Turning to substantive legal principles, the version of the Parole Act of 1979 (Act) in effect when the inmate committed the crime governs the parole eligibility decision. See Williams v. N.J. State Parole Bd., 336 N.J. Super. 1, 7 (App. Div. 2000). It is undisputed that because M.B. committed the pertinent crimes in 1992, the pre-amended version of the Act, N.J.S.A. 30:4-123.53, applies.[2] That version of the Act provides that an inmate shall be released on parole unless the Board shows "by a preponderance of the evidence . . . there is a substantial likelihood that the inmate will commit a crime under the law of this State if released on parole at such time." N.J.S.A. 30:4-123.53(a); see also Berta, 473 N.J. Super. at 304-05.

The Board's specialized expertise is critical in applying that test because it must "make[] 'highly predictive and individualized discretionary appraisals'" in assessing an inmate's suitability for parole. Acoli v. N.J. State Parole Bd. (Acoli I), 224 N.J. 213, 222 (2016) (quoting Beckworth v. N.J. State Parole Bd., 62 N.J. 348, 359 (1973)). Those appraisals, our Supreme Court acknowledged,

---

[2] The Parole Act of 1979 was significantly revised in 1997.

are "inherently imprecise." Ibid. Indeed, the Acoli I Court emphasized that the Board's "discretionary assessment[s]" turn on "a multiplicity of imponderables." Ibid. (alteration in original) (quoting Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 10 (1979)).

When rendering a parole decision, the Board must consider "the aggregate of all pertinent factors" enumerated in the regulation as well as "any other factors deemed relevant." N.J.A.C. 10A:71-3.11; see also Beckworth, 62 N.J. at 360. The regulation lists the following relevant factors:

> 1. Commission of an offense while incarcerated.
>
> 2. Commission of serious disciplinary infractions.
>
> 3. Nature and pattern of previous convictions.
>
> 4. Adjustment to previous probation, parole and incarceration.
>
> 5. Facts and circumstances of the offense.
>
> 6. Aggravating and mitigating factors surrounding the offense.
>
> 7. Pattern of less serious disciplinary infractions.
>
> 8. Participation in institutional programs which could have led to the improvement of problems diagnosed at admission or during incarceration. This includes, but is not limited to, participation in substance abuse programs, academic or vocational education programs, work assignments that provide on-the-job training and individual or group counseling.

9. Statements by institutional staff, with supporting documentation, that the inmate is likely to commit a crime if released; that the inmate has failed to cooperate in [their] own rehabilitation; or that there is a reasonable expectation that the inmate will violate conditions of parole.

10. Documented pattern or relationships with institutional staff or inmates.

11. Documented changes in attitude toward self or others.

12. Documentation reflecting personal goals, personal strengths or motivation for law-abiding behavior.

13. Mental and emotional health.

14. Parole plans and the investigation thereof.

15. Status of family or marital relationships at the time of eligibility.

16. Availability of community resources or support services for inmates who have a demonstrated need for same.

17. Statements by the inmate reflecting on the likelihood that [they] will commit another crime; the failure to cooperate in [their] own rehabilitation; or the reasonable expectation that [they] will violate conditions of parole.

18. History of employment, education and military service.

19. Family and marital history.

20. Statement by the court reflecting the reasons for the sentence imposed.

21. Statements or evidence presented by the appropriate prosecutor's office, the Office of the Attorney General, or any other criminal justice agency.

22. Statement or testimony of any victim or the nearest relative(s) of a murder/manslaughter victim.

23. The results of the objective risk assessment instrument.

24. Subsequent growth and increased maturity of the inmate during incarceration.

[N.J.A.C. 10A:71-3.11(b).]

If parole is denied, the Board must set an FET. See N.J.S.A. 30:4-123.56; N.J.A.C. 10A:71-3.21. When a panel denies parole to an inmate serving a sentence for murder, N.J.A.C. 10A:71-3.21(a)(1) prescribes a standard FET of twenty-seven months. The Board, in its discretion, may increase or reduce the standard FET by up to nine months. N.J.A.C. 10A:71-3.21(c). N.J.A.C. 10A:71-3.21(d) further provides that a three-member Board panel may establish an FET outside the guidelines if the presumptive FET is "clearly inappropriate due to the inmate's lack of satisfactory progress in reducing the likelihood of criminal behavior." In making that determination, the Board must consider the same non-exhaustive list of factors enumerated in N.J.A.C. 10A:71-3.11(b) that are used to determine whether the inmate is suitable for release on parole.

### III.

With those foundation legal principles in mind, we address M.B.'s contention "the Board could not have reasonably concluded based upon [M.B.'s] words and actions that a substantial likelihood exists that he will commit another crime if released." More specifically, M.B. contends the Board committed three principal errors. First, he argues that there is a lack of evidence—indeed, overwhelming contrary evidence—to support the Board's conclusion regarding his "lack of insight." M.B. points to the programs he completed that "confirm his efforts toward rehabilitation," which, he asserts, "is an ongoing process."

Second, M.B. argues the Board was arbitrary in relying upon "the patently absurd, unsupported claim" that he has not sufficiently addressed his substance abuse problem. Third, he contends the Board failed to give appropriate weight, and even ignored his subsequent growth, increased maturity. He adds that "his advanced age of [seventy-one] combined with his significant health issues, all demonstrate that he is substantially unlikely to commit another crime."

While this is a close case, we are satisfied the Board's decision with respect to these issues does not amount to an abuse of discretion, considering that such appraisals are "inherently imprecise" and turn on "a multiplicity of imponderables." Acoli I, 224 N.J. at 222 (quoting Greenholtz, 442 U.S. at 10).

22

The Board cited to the parts of the record that support its conclusion with respect to insufficient problem resolution, noting, for example, the panel considered an interview, pre-parole report, and the confidential mental-health evaluation, "which had a significant impact upon the Board's decision." More specifically, the Board highlights M.B.'s responses at the hearings and his description of the fatal confrontation with his wife as a "disagreement." The Board further states that "the pre-sentence report and pre-parole psychological evaluation indicate that [M.B.] attributed the murder to excessive use of alcohol, and that he 'drank heavily' the night before the murder." When asked what he would do "if [he] got the urge to use drugs" if he were released on parole, M.B. responded "if I'm out in the community, I would have a sponsor . . . and I would get to my sponsor."

The Board also cited to M.B.'s institutional infraction history, noting his infractions involved weapons, an assault, and drugs. At the hearing, M.B. responded, "I have no answer for that. I have one infraction. One assault in prison. The weapon was a can of beans. I didn't use a weapon on anyone." The Board also found that M.B. became agitated when testifying and disputed the underlying facts regarding the 2014 assault infraction. We decline to substitute our judgment for the Board's in evaluating the impact of defendant's testimony.

23

IV.

M.B. cites Acoli III to support his argument that his lack of insight improperly became the lynchpin of the Board's decision. In Acoli III, our Supreme Court rejected the Board's reasoning and ordered the inmate's release on parole. 250 N.J. at 472. The Court determined that in denying parole, the Board had "taken refuge in threadbare findings that Acoli lacks insight into the conduct that led him to his involvement in the crimes he committed in 1973 and that he still refuses to take responsibility for his acts." Id. at 460.

We are satisfied that Acoli III is distinguishable. In that case, during the hearing, the Board questioned the inmate for over six hours, asking over a dozen times who killed the victim. Id. at 462. When Acoli repeatedly responded that he did know, the Board induced him to speculate and then used his answer that it was "friendly fire" from someone else as a "pivotal basis" for denying parole. Ibid. The Court held that "the Board concentrated its attention on the details of the crime to the exclusion of much else, such as his institutional progress over the previous twenty-five years." Id. at 463. While acknowledging, "[t]he Board surely had the right to revisit the terrible deeds that Acoli had done," id. at 463, the Court emphasized that "an inmate's inadequate or inaccurate recollection of the specifics of his crime does not directly bear on whether there is a substantial

24

likelihood that he will reoffend today and cannot form the basis for denying parole," ibid.

In this case, the Board also interpreted M.B.'s testimony in determining whether he has sufficiently addressed his problems, noting M.B. was unable to explain why a verbal disagreement with his wife resulted in her murder. But in contrast to Acoli III, we are not dealing with a situation where a defendant was maintaining his innocence or lacked memory and that circumstance was used as a critical if not paramount aggravating factor. Here, defendant admitted his guilt but was unable, in the Board's judgment, to satisfactorily explain why he stabbed the victim to death. We conclude the Board acted within the ambit of its discretion when it assessed M.B.'s credibility with respect to the information he offered about the crimes he committed.

Importantly, moreover, the Board did not rest its decision solely on defendant's insight into the causes of his past violence, but rather also considered other facts in the record, including his history of disciplinary infractions.

## V.

We next address M.B.'s contention that the Board failed to sufficiently weigh his age, health, and family support. M.B. cites studies showing that the risk of recidivism decreases with age, particularly with regard to persons over

A-2117-22

seventy. But as the Board correctly noted, age is not a dispositive factor. Importantly, moreover, the record shows the Board did consider his age.

We likewise are unpersuaded by M.B.'s contention that "although the Board acknowledged [M.B.]'s multiple letters of support, it failed to adequately address the letters' subject matter and their relevance to his low risk of reoffending." The record shows the Board considered the letters of support as a mitigating factor. We decline to substitute our judgment for the Board's in weighing this factor as part of the totality of relevant circumstances. The governing regulation requires the Board to consider the aggregate of all pertinent enumerated factors as well as any other factors deemed relevant. N.J.A.C. 10A:71-3.11; see also Beckworth, 62 N.J. at 360 ("Common sense dictates that [the Board's] prediction as to future conduct . . . be grounded on due consideration of the aggregate of all of the factors which may have any pertinence.").

We add that while the Board considered M.B.'s record of institutional infractions to be an aggravating circumstance, especially with respect to the last one which involved a physical confrontation with an officer, the Board also noted the progress he has made during his incarceration.

26

Furthermore, the Board properly considered M.B.'s LSI-R score, which indicated a "high" chance of recidivism. We are unpersuaded by M.B.'s contention that assessment tool is "faulty," "backward-looking," and "not necessarily used to predict future criminal offending."

Relatedly, M.B. argues the confidential psychological evaluation has inconsistencies and contradictions with the record that indicate it is unreliable. That evaluation concluded that M.B. has a history of "poor emotional control, emotional reactivity, [and] irritability . . . [indicating that he] appears to be at least medium risk of future violence." We see no abuse of discretion in the Board's consideration of the evaluation as part of the aggregate of aggravating and mitigating factors.

## VI.

Finally, we address M.B.'s contention, raised for the first time on appeal, that the Board violated his due process rights when it denied him access to his confidential psychological reports.

In Thompson v. N.J. State Parole Board, we held that a person seeking parole has a qualified due process right to materials "the Board states . . . played a substantial role in producing the adverse decision in a case appealed" which a determination that a specific document cannot be released due to "institutional

27

security" and "prisoner rehabilitation" concerns can overcome.[3] 210 N.J. Super. 107, 124-27 (App. Div. 1986). We acknowledged that approach may add to the Parole Board's burdens, but "will sufficiently protect the prisoner's due process rights with the least intrusion on the Department of Correction's legitimate concern for confidentiality." Id. at 125-26. We also acknowledged:

> The safe operation of a prison must be taken into account in determining the extent of legal process due a prisoner in the consideration of his parole release. Disclosures threatening to institutional security must be avoided. They may include evaluations and anonymous reports of fellow prisoners and of custodial staff members. Disclosure of therapeutic matters also should be avoided if it would interfere with prisoner rehabilitation and relationships with therapists.
>
> [Id. at 123.]

---

[3] N.J.A.C. 10A:71-2.1 has been amended since Thompson was decided. Language that confidential material should be disclosed when "disclosure would not threaten the life or physical safety of any person, interfere with law enforcement proceedings or result in the disclosure of professional diagnostic evaluations which would adversely affect the inmate's rehabilitation or the future delivery of rehabilitative services" was removed. 20 N.J.R. 2129(a) (Sept. 6, 1988). After the passage of the Open Public Records Act, N.J.S.A. 47:1A-1 to 13.3, the regulation was amended again and recodified as N.J.A.C. 10A:71-2.2. See 43 N.J.R. 2144(b) (Aug. 15, 2011); 44 N.J.R. 270(a) (Feb. 6, 2012). We note that the language concerning disclosure that "would compromise the safety of the inmate or others, or the security or orderly operation of the correctional facility" remains in N.J.A.C. 10A:22-2.7(d).

In the present matter, five reasons were cited for preserving the confidentiality of the psychological report: (1) fear of retaliation against the evaluator preparing the report; (2) potential manipulation of future evaluations prepared for parole consideration; (3) may result in inmate being less than forthcoming in future evaluations; (4) permits evaluator to assess inmate fairly without risk of retaliation or reprisal; and (5) endangerment of life or physical safety or person.

We see no due process violation in this instance.

To the extent we have not specifically addressed them, any remaining arguments raised by M.B. lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

### VII.

In sum, although we might have released M.B. on parole were it our decision to make in the first instance, we have no basis on the present record for appellate intervention. As we have noted, the situation might change in the future if it becomes apparent that the reasons cited by the Board indicate that M.B. will never be granted parole and will always be given the maximum possible FET. Cf. Berta, 473 N.J. Super. at 321.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

29

A-2117-22