**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0534-24

SHAKIR KELLY, a/k/a
SHAKIR A. KELLY,

      Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

      Respondent.

_____

Argued January 22, 2026 – Decided February 19, 2026

Before Judges Currier, Berdote Byrne, and Jablonski.

On appeal from the New Jersey State Parole Board.

Thomas B. McQuillan, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Thomas B. McQuillan, of counsel and on the brief).

Andrew D. Spevack, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Acting Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Andrew D. Spevack, on the brief).

PER CURIAM

Petitioner Shakir Kelly appeals from the New Jersey Parole Board's September 25, 2024 final agency decision, which revoked his mandatory supervision status and imposed a twelve-month parole eligibility term. Although he admitted to certain violations of parole conditions, he contends he was denied the opportunity to challenge the validity of his discharge from a Volunteers of America (VOA) substance abuse treatment program because the Parole Board considered it "res judicata." After careful review, we affirm the Parole Board's revocation of petitioner's mandatory supervision status and imposition of a twelve-month parole eligibility term.

I.

According to the record, on May 23, 2019, Newark police officers on patrol on South 10th Street observed a black car parked illegally in a crosswalk. A registration check revealed the car was stolen from Matawan. Officers witnessed a man, later identified as Kelly, enter the vehicle. The officers activated their lights and sirens, but Kelly drove off, evading the officers by ramming the stolen car into their police cruiser and driving away at high speed.

On the same day, Newark police officers received a report of a robbery. The officers met with the victim, who stated she was taking out her garbage

A-0534-24

when Kelly approached, struck her with a closed fist on the left side of her head, and took two phones from her. Later that day, Newark police located Kelly, and after a foot-chase, eventually detained and arrested him.

Kelly pleaded guilty to two counts of second-degree aggravated assault and one count of second-degree resisting arrest. On July 9, 2021, the court sentenced Kelly to five years of incarceration, with eighty-five percent parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2, and three years of parole supervision post release, all to run concurrently.

As a juvenile, Kelly had accumulated four prior adjudications. As an adult, Kelly has seven prior indictable convictions, including convictions for resisting arrest, possession of a controlled dangerous substance (CDS), receiving stolen property, and burglary. At the time of his sentencing in 2021, Kelly had served seven sentences of probation, and during those periods had three violations of probation.

Between October 21, 2022, and June 30, 2024, during Kelly's periods of incarceration (including after his return to custody in March 2024), he committed five disciplinary infractions, including assault of a staff member on June 2, 2024, and, later the same month, possession of narcotics and being intoxicated.

A-0534-24

Kelly was released at the completion of his sentence to mandatory supervision on August 21, 2023, and although he did report to the Newark Office for his first visit on October 4, 2023, he did not attend his scheduled intake at the Greater Essex Counseling Center for drug counseling three weeks later. During his initial visit to the District Office, Kelly admitted he had spent the previous night away from his approved residence with his sister, and became verbally combative with staff members. Two days later, Kelly's girlfriend reported to his parole officer that Kelly had choked her to the point of unconsciousness the previous day. As a result, parole issued a no-contact Special Condition prohibiting Kelly from contacting her.

On October 8, 2023, Newark Police officers responded to an in-progress domestic violence call from Kelly's girlfriend who stated Kelly had forced himself into her residence by taking the window off the frame, running after her as she tried to escape, and placing her in a head lock. Newark Police also reported Kelly had threatened his girlfriend, stating, "I'm [gonna] get the gun."

Kelly failed to report to parole as scheduled on October 20, and October 24. On October 25, the Newark Police Department arrested Kelly on an outstanding warrant for burglary, simple assault, and terroristic threats. Kelly reported to the Newark Office on November 1, 2023, where he failed a urine test

A-0534-24

and admitted to using alcohol the day before. Kelly was then afforded an opportunity to continue counseling at the Greater Essex Counseling Center and was mandated to comply with GPS electronic monitoring and a 9:00 p.m. to 7:00 a.m. curfew, to which he agreed.

During a home visit on February 19, 2024, Kelly tested positive for alcohol but was given another opportunity to continue with counseling services with an increase in the level of care, including placement on lockdown for the night and an updated exclusion zone.

On March 5, 2024, Newark Police arrested Kelly for possession of CDS, resisting arrest, and obstruction after observing him making transactions in an open-air drug market. During these transactions, Kelly was driving a vehicle registered to his girlfriend, with whom he was prohibited from having contact pursuant to the Special Condition.

Kelly was released from custody two days later and reported to the Newark Office where he tested positive for cocaine, opiates, and fentanyl. Kelly admitted to using heroin and cocaine several days prior and provided a written statement admitting to the drug usage and having prohibited contact with his girlfriend. A search of his cellphone revealed evidence confirming the contact

A-0534-24

with his girlfriend. As a result of this noncompliance, Kelly was referred to a residential treatment facility with a more structured setting, the VOA.

Upon arrival at the VOA on March 13, 2024, Kelly was transported to the Newark Police Department for processing on charges related to his March 5, 2024 arrest. Kelly returned to the VOA three days later, and within three days was disciplined for two major program violations.

First, on March 18, 2024, staff member Clayton Neal reported Kelly had disrespected him. Neal reported Kelly had approached him at the front desk and requested to change his phone time, and when Neal advised the rules forbid changing his time, Kelly "verbally assault[ed]" Neal, calling him a "Bitch Ass," and refused to walk away when asked to, threatening, "What you [gonna] do if i don't[?]"

The next day, Shift Supervisor Sarah Quann reported that treatment assistant Kyle Henderson was conducting observational rounds on the second floor when he observed Kelly making "awkward movements" around his assigned bed in room 207. Henderson entered the room and searched Kelly's bed area, where he found an eyeglass case hidden under the sheet, inside which he discovered "a lighter, tobacco, and green nugget cannaboid substance which

6

resembles marijuana." Kelly was discharged from the program due to the two violations.

A parole warrant was issued on March 19, 2024, and a probable cause hearing was scheduled regarding the following supervision violations Kelly had accumulated:

> 1. General Condition 13(i)—failure to refrain from the unlawful use or possession of any controlled dangerous substances (CDS) for the admitted use of heroin on March 4, 2024;
>
> 2. General Condition 13(i)—failure to refrain from the unlawful use or possession of any controlled dangerous substances (CDS)—for the admitted use of cocaine on March 5, 2024;
>
> 3. Special Condition—failure to comply with the conditions of and successfully complete the RESAP Addiction Treatment program at the VOA—for the discharge on March 20, 2024;
>
> 4. Special Condition—failure to refrain from contact with girlfriend—for the admissions on March 7, 2024; and
>
> 5. Special Condition—failure to refrain from the possession or use of alcohol—for the admissions dated October 31, 2023, and February 19, 2024.

On March 20, 2024, Kelly was taken into custody.

A hearing officer conducted a Final Revocation Hearing on April 12, 2024. Kelly acknowledged receipt of the Notice of Probable Cause Hearing,

A-0534-24

which contained the alleged violations and their respective evidence, and his rights with respect to the hearing process and procedure. He elected to represent himself.

Upon reading the violations into the record, Kelly pleaded guilty with an explanation to violations one and two (general condition thirteen), stating that he started abusing substances because the mental health program at Rutgers that he had been attending had been cancelled, and he could not obtain his mental health medication. As to the fourth violation, the Special Condition requiring him to refrain from unauthorized contact with his girlfriend, Kelly also pleaded guilty with an explanation, stating that he knew it was wrong, but he was "checking on her" during her pregnancy. Kelly pleaded guilty to the fifth violation, the Special Condition requiring Kelly to refrain from the use of alcohol.

However, Kelly pleaded not guilty to violation three, the Special Condition requiring Kelly to complete the VOA Addiction Treatment Program. At the hearing, a parole officer produced the VOA discharge papers and the incident reports. The VOA discharge report recounted the two incidents it concluded warranted Kelly's discharge from the program.

Kelly argued he should not have been discharged, stating, "[I]f I was found with some type of illegal substance I was, at least, supposed to get a drug test to state that I was using these things." He also challenged the report because it did not include information that there was a bag with another person's information on it. Still, acknowledging that Henderson told the "absolute truth" during his testimony, Kelly stated he couldn't say who the eyeglasses case belonged to because he was put on the spot in front of all the other residents. Lastly, Kelly stated that "there's more drugs in that program than anywhere I ever been" and the program "is not a good program" because they were not helping him.

The hearing officer ultimately considered: (1) Kelly's violent criminal history, including the most recent offense, marking his eighth felony conviction; (2) Kelly's inability to comply with the conditions of his supervision, including four probation violations; (3) Kelly had been afforded several opportunities to gain compliance after violating his conditions; (4) Kelly's admission to several violations; and (5) a parole warrant had been issued. The hearing officer found Kelly was likely to reoffend, presented a risk to public safety if he were permitted to return to the community, and recommended revocation.

A-0534-24

On April 24, 2024, the Parole Board panel concurred with the findings of fact made by the hearing officer and found clear and convincing evidence demonstrating Kelly violated the General Condition prohibiting the unlawful use or possession of any controlled dangerous substances, the Special Condition prohibiting his contact with his girlfriend, the Special Condition prohibiting alcohol use, and the Special Condition requiring completion of the VOA Treatment Program. The Board panel concluded, based on seriousness of the violations and the fact that Kelly had pleaded guilty to having violated all but one of the conditions, revocation was appropriate. Thus, the Board panel unanimously revoked Kelly's parole and ordered him to serve a parole eligibility term of twelve months.

Kelly, now represented by counsel, appealed to the full Parole Board, arguing the Board panel failed to consider material facts, including: (1) the fact that Henderson's testimony at the hearing was "inconsistent" with his written report; and (2) facts tending to exonerate Kelly regarding the alleged violation of the Special Condition requiring his compliance with the conditions of the VOA treatment program. Specifically, Kelly argued the zip lock bag containing the synthetic marijuana had someone else's name and State Bureau Identification (SBI) number on it. Kelly's appeal did not address any of the other violations.

A-0534-24

The Parole Board considered these arguments but ultimately sustained the Board panel's findings and conclusions, noting the issues regarding the zip lock bag and Henderson's testimony were addressed and considered at the hearing, and thus, res judicata. Thus, the Parole Board considered Kelly's "contention that the Board panel failed to consider the material facts in this matter, to be without merit." The Parole Board found that Henderson testified to key information regarding the violation, namely, that he was familiar with Kelly; he noticed suspicious activity in Kelly's room during an observational round; he entered the room and saw another client by Kelly's bed; he pulled back the sheet on Kelly's bed and saw an eyeglass case; the case contained a lighter, tobacco, and a nugget of a green leafy substance. In addition, the Board noted Kelly testified he does not wear glasses; he did not have any property; the eyeglasses case containing tobacco and "weed" had another person's name and SBI number on it; the other person's name should have been on the incident report, and he should have been drug tested.

Importantly, the Parole Board found no issue regarding whether Kelly was discharged from the VOA Program—something that the Parole Board cannot control. Further the Parole Board noted the decision to revoke Kelly's mandatory supervision status was based on four violations, not just one.

A-0534-24

This appeal followed.

## II.

The parole revocation process is governed by statute, N.J.S.A. 30:4-123.45 to -.76; and regulation, N.J.A.C. 10:A-71-7.1 to -7.18. "[W]e are deferential to an agency's expertise." Berta v. N.J. State Parole Bd., 473 N.J. Super. 284, 302 (App. Div. 2022). Parole Board "members are appointed to bring [their] expertise in 'law, sociology, criminal justice, juvenile justice or related branches of the social sciences.'" Acoli v. N.J. State Parole Bd., 224 N.J. 213, 222 (2016) (quoting N.J.S.A. 30:4-123.47(a)). "Drawing on the diverse backgrounds of its members, the Parole Board makes 'highly predictive and individualized discretionary appraisals.'" Ibid. (quoting Beckworth v. N.J. State Parole Bd., 62 N.J. 348, 359 (1973)). Therefore, our review of the Parole Board's decision is limited. Hare v. N.J. State Parole Bd., 368 N.J. Super. 175, 179 (App. Div. 2004). We will "not substitute [our] own judgment . . . even though [we] might have reached a different result." In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). We consider:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which

12

the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Berta, 473 N.J. Super. at 302 (quoting In re Carter, 191 N.J. at 482-83).]

Kelly must establish the Parole Board's decision "was arbitrary, unreasonable or capricious." McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002). "[R]evocation [is permitted] only on proof by clear and convincing evidence that the person 'has seriously or persistently violated the conditions.'" Hobson v. N.J. State Parole Bd., 435 N.J. Super. 377, 382 (App. Div. 2014) (quoting N.J.S.A. 30:4-123.60(b) and N.J.S.A. 30:4-123.63(d)); see also N.J.A.C. 10A:71-7.12(a) ("A parole revocation hearing shall be conducted when: (1) A hearing officer determines that probable cause exists to believe that the parolee has seriously or persistently violated the conditions of parole and that revocation of parole is desirable."). "The Legislature did not . . . define the type of conduct it intended to capture within the statutory standard – 'seriously or persistently violated.'" Hobson, 435 N.J. Super. at 382.

We are convinced Kelly has failed to satisfy his burden. First, Kelly has not established the Parole Board failed to follow the law. Kelly was afforded

13

the opportunity to provide his version and explanations for all of the alleged parole violations, including his discharge from the VOA. Second, there was "substantial evidence" to support the finding Kelly had received a disciplinary discharge from the VOA for two separate reasons in the course of his first days there and, therefore, failed to successfully complete the program as required by the Special Condition – regardless of the reasons. Although the term "res judicata" may have been used inartfully by the Parole Board, it was used to explain that the Parole Board did not have the ability to undo the VOA's discharge from the program, finding: "The determination of the VOA to discharge Mr. Kelly from the program is res judicata, and the Board is not intended to relitigate the cause of Mr. Kelly's disciplinary discharge from the program." The discharge was effectuated because the VOA found Kelly had violated its own rules, notwithstanding the suggestion of evidence that the contraband did not belong to him.

More importantly, Kelly did not establish the Parole Board made a clear error in revoking his parole as he pleaded guilty to four other violations. Kelly's contention that he did not seriously or persistently violate the conditions of his parole is belied by this record, which shows he violated conditions of parole immediately and consistently since the commencement of his parole term.

14

To the extent we have not addressed Kelly's other arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

15